# STATE OF CONNECTICUT *v.* GILBERTO L.*
## (SC 18213)

Rogers, C. J., and Palmer, Vertefeuille, Zarella and Sullivan, Js.

* In accordance with our policy of protecting the privacy interests of sexual abuse victims, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued January 15—officially released June 23, 2009

*Suzanne Z. Curtis*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Cornelius P. Kelly*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Gilberto L., appeals from the judgment of conviction, rendered after a jury trial, of one count of risk of injury to a child in violation of

General Statutes (Rev. to 2003) § 53-21 (a) (1),[1] and one count of risk of injury to a child in violation of § 53-21 (a) (2). The defendant claims, inter alia, that the judgment should be reversed and a new trial ordered because the trial court violated his right under the sixth[2] and fourteenth[3] amendments to the United States constitution and Practice Book §§ 44-7[4] and 44-8[5] to be present at trial. He specifically claims that the trial court improperly replayed[6] crucial portions of the trial

[1] Hereinafter, all references to § 53-21 are to the 2003 revision.

[2] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . [and] to have compulsory process for obtaining witnesses in his favor . . . ."

The sixth amendment rights to confrontation and to compulsory process are made applicable to the states through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (right to confrontation); see *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to compulsory process).

[3] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No state shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[4] Practice Book § 44-7 provides in relevant part: "The defendant has the right to be present at the arraignment, at the time of the plea, at evidentiary hearings, at the trial, and at the sentencing hearing, except as provided in Sections 44-7 through 44-10. Whenever present, the defendant shall be seated where he or she can effectively consult with counsel and can see and hear the proceedings. . . ."

[5] Practice Book § 44-8 provides: "The defendant must be present at the trial and at the sentencing hearing, but, if the defendant will be represented by counsel at the trial or sentencing hearing, the judicial authority may:

"(1) Excuse the defendant from being present at the trial or a part thereof or the sentencing hearing if the defendant waives the right to be present;

"(2) Direct that the trial or a part thereof or the sentencing hearing be conducted in the defendant's absence if the judicial authority determines that the defendant waived the right to be present; or

"(3) Direct that the trial or a part thereof be conducted in the absence of the defendant if the judicial authority has justifiably excluded the defendant from the courtroom because of his or her disruptive conduct, pursuant to Section 42-46."

[6] Although the state uses the term "readback," we use the term "playback," the same term that the trial court used to describe the proceeding. All references in this opinion to the "playback" of testimony include either the

testimony during jury deliberations when he was unable to be present due to circumstances beyond his control and that the court's curative instructions failed to minimize the prejudicial effect of his absence. He further claims that he was deprived of his right to a fair trial because the senior assistant state's attorney (prosecutor) made several improper comments during closing argument that were not mitigated by the trial court's instructions to the jury. The state replies that the playback of testimony did not occur during a "critical stage" of the proceedings, and, therefore, the defendant was not substantially prejudiced merely because he was absent. The state adds that the trial court instructed the jury not to consider the defendant's absence and that it is to be presumed that jury instructions are followed. The state also argues that the prosecutor's comments during closing argument were not improper, and, to the extent that they were, any potential prejudice to the defendant was cured by the court's instructions to the jury. We affirm the judgment of the trial court.

A jury reasonably could have found the following facts. On or about June 3, 2003, the victim, an eight year old girl, rode around the block for about ten minutes in the defendant's car, starting in front of her home. No one other than the defendant and the victim was present in the car at the time. After she entered the car on the front passenger side, she moved closer to where the defendant was sitting because she wanted to drive. She then positioned herself so that she was standing in front of the defendant with her hands on the wheel while the defendant was sitting on the driver's seat operating the pedals. She was wearing blue shorts, a blue shirt and underwear at the time. While she was standing in front

actual playback of testimony, pursuant to which the court reporter plays a tape-recorded version of the testimony to the jury, or a "readback" of testimony, pursuant to which the court reporter reads the testimony to the jury from a transcript.

of the defendant, the victim felt the defendant's "private" touch her "behind." She also recalled that the defendant put his "private" inside her underwear while she was standing and that, when she sat down, she felt it "in the same place [as] before." She did not, however, see the defendant's "private," he did not touch any other part of her body, and his "private" did not move while it was touching her. When she returned from the ride, she and the defendant said goodbye, and she exited the car on the front passenger side. Upon leaving the car, she saw that the zipper on the defendant's pants was down.

After the defendant dropped the victim off at her house, she went upstairs to the bathroom, put her clothes in the hamper, which contained other dirty clothes, and took a shower. She noticed at the time that her shorts felt wet. Although her mother and a friend were inside the house when she returned, the victim did not tell them what had happened because she thought that her mother would yell at her for going on the ride. When her mother asked her if anything had happened, she said "no."

The victim wanted to tell her mother about what had happened and felt bad that she had not done so. She became quiet after the incident, which was not in her nature. A few days later, however, she told her mother, her older brother and his girlfriend about the incident, and the family informed the police.

Following an investigation, the defendant was arrested and charged with attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 and 53a-49, one count of risk of injury to a child in violation of § 53-21 (a) (2), and a second count of risk of injury to a child in violation of § 53-21 (a) (1). The defendant pleaded not guilty and elected to be tried by a jury.

The trial commenced on July 22, 2005. On August 15, 2005, the jury found the defendant not guilty of attempt to commit sexual assault in the first degree but guilty of two counts of risk of injury to a child. On January 19, 2006, the court sentenced the defendant to a total effective sentence of twelve years incarceration, execution suspended after eight years, and ten years probation. This appeal followed.[7]

I

The defendant first claims that he was deprived of his right to be present at trial under the federal constitution and the rules of practice when the trial court improperly denied defense counsel's motion for a mistrial and ordered the playback of trial testimony during jury deliberations when he was involuntarily absent. He claims that (1) there was no indication that any members of the jury could not wait to finish the playback until after his return to the courtroom, (2) his expected return was only eleven days after the court permitted the playback in his absence, and, therefore, the total length of time that the jury would have been required to serve was not great because the trial itself had not been lengthy, (3) the playback constituted a critical stage of the proceedings during which he should have been present, and (4) the trial court's instructions were inadequate to cure the prejudicial effect of his absence. We disagree.

The following additional facts are relevant to our resolution of this claim. The jury began its deliberations on Tuesday, July 26, 2005. At approximately 4 p.m., the jury sent a note to the court requesting a playback of the defendant's and the victim's testimony. Although the record does not indicate whether the defendant was

---

[7] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

present at that time, counsel for both sides were present and did not object to the jury's request to hear the playback.[8] When the jurors entered the courtroom, the court stated that it would allow them to hear the playback for approximately fifteen minutes before adjourning and would finish playing the remaining portion of the requested testimony two days later on Thursday, July 28. The court further stated that the jurors could take notes during the playback and gave instructions on the "ground rules" for note taking. The court emphasized, however, that it was the jurors' recollections, not their notes, that should guide them if there was a conflict between the two. The court also reminded the jurors that their notes were not evidence and that the verdict must be based exclusively on the evidence presented at trial. Neither party objected to the taking of notes during the playback. Thereafter, the court ran the playback for several minutes and then excused the jurors until July 28.

When the court reconvened on July 28, it noted for the record, outside the jurors' presence, that the defendant had been admitted to the hospital at 3 a.m. that morning due to a severe case of diverticulitis and that his physician had stated that his earliest possible release would not be until the following Monday morning, August 1. The court also stated that counsel had agreed to comply with its request not to be present because seeing counsel unaccompanied by the defendant might

---

[8] The following remarks by the court indicate that it had informed counsel of the jury's note off the record and most likely had obtained their agreement prior to reconvening:

"The Court: As . . . counsel is aware . . . we've asked for a replay of the testimony of [the victim] and . . . [the defendant]. . . . We'll get started on it today, counsel. I'm going to allow them to take notes during this part of the trial. Okay . . . bring out the jurors. . . . Stipulate all the jurors are present, counsel?

"[The Prosecutor]: Yes, Your Honor.

"[Defense Counsel]: Yes, Your Honor."

cause the jurors to view the defendant in a negative light. The court explained that it intended to address the jurors without revealing the cause of the delay and then excuse them for the day, an approach with which both counsel previously had agreed. The jurors then entered the courtroom, and the court stated that something unanticipated had "come up" that the court "ha[d] to work on." The court asked the jurors to "trust . . . in that statement" and apologized more than once for the unexpected disruption. After instructing the jurors on how to contact the court for further information regarding when the proceedings would resume, it excused them for the day. As soon as the jurors left the courtroom, counsel for the parties entered, and the court explained what had just transpired. Counsel acknowledged that they had waived their right to be present during the court's discussion with the jurors and expressed their agreement with what the court had said and done.

On August 1, the court reconvened and told counsel, outside the presence of the jurors, that the earliest day that the defendant would be released from the hospital was Wednesday, August 3, and that it would like to speak with the jurors again in the same manner as it did before. After counsel consented and left the courtroom, the court met with the jurors, informed them that something had come up that it had to work on and excused them until Thursday morning, August 4.

When the proceedings resumed on August 4, the court informed counsel that the defendant had been released from the hospital on Tuesday, August 2, but had been rushed back early that morning and was currently sedated and unable to attend the proceeding. Defense counsel moved for a mistrial because the defendant would be absent for the scheduled playback, which the defense characterized as a critical stage of the proceedings. Defense counsel argued that the defendant would

be constitutionally prejudiced if the playback resumed without the defendant because the jurors might draw a negative inference from his involuntary absence. The state replied that a mistrial was unwarranted because the playback did not constitute a critical stage of the proceedings and the court could issue a curative instruction. The state also noted that it had prepared a waiver for the defendant to sign on the basis of information from his girlfriend that he wanted the trial to continue in his absence, but, because he was sedated at the hospital, he had been unable to execute the waiver.

The court announced that it would proceed with the playback after issuing a curative instruction. Defense counsel objected to the giving of the jury instruction because it would highlight the defendant's absence at a time when the jury was still deliberating. The court replied, however, that it did not believe that the defendant's constitutional rights would be violated if he was not present during the playback because his absence would not have a "substantial effect" on his opportunity to defend himself and he would be represented by counsel during the playback. Finding "no demonstrable prejudice" in continuing the playback, the court denied the motion for a mistrial.

Following a brief recess, the jurors entered the courtroom, and the court instructed them as follows: "I suspect you note the nonpresence of the defendant here this morning. You are to draw no negative inference from his absence. This court has no information—no information has been brought to my attention that would show him to be in violation of any court orders. You are specifically instructed to completely disregard this fact. It is to have no role—or have no bearing whatsoever in your decision in this case and in your consideration of the evidence. We are going to proceed with the [playback] and your deliberations." The playback then continued until lunchtime, when the court

recessed. The court thereafter reconvened, and the playback continued. After the playback ended, the jury resumed its deliberations. Later that day, the jury reached a verdict, which was sealed but not announced due to the defendant's absence. On Monday, August 15, the defendant appeared in court, and the court announced the verdict of guilty of two counts of risk of injury to a child.

"The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 702, 911 A.2d 1055 (2006).

## A

We turn first to the defendant's constitutional claim, which defense counsel properly preserved when he objected on constitutional grounds to the continuation of the playback on August 4 and moved for a mistrial. "The constitutional right of a criminal defendant to be personally present at all significant junctures of his

prosecution is a fundamental tenet of criminal jurisprudence . . . . *State* v. *Lopez*, 271 Conn. 724, 732, 859 A.2d 898 (2004). [T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. *Rushen* v. *Spain*, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983). The right of the defendant to be present has been extended, via the due process clause, beyond its origins in the confrontation clause of the sixth amendment to encompass situations [in which] the defendant is not actually confronting witnesses or evidence against him. *State* v. *Lopez*, supra, 732; see also *Monroe* v. *Kuhlman*, 433 F.3d 236, 246 (2d Cir. 2006) ([t]he [United States] Supreme Court has held that the right to be present at one's criminal trial is protected by due process in cases [in which] . . . the claimed error does not relate to the defendant's opportunity to confront witnesses or evidence). In judging whether a particular segment of a criminal proceeding constitutes a critical stage of a defendant's prosecution, courts have evaluated the extent to which a fair and just hearing would be thwarted by [the defendant's] absence or whether his presence has a relation, reasonably substantial, to the [fullness] of his opportunity to defend against the charge. . . . *State* v. *Lopez*, supra, 732, quoting *Kentucky* v. *Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)." (Internal quotation marks omitted.) *State* v. *Bonner*, 290 Conn. 468, 491–92, 964 A.2d 73 (2009). Neither the United States Supreme Court nor this court, however, has had the opportunity to address whether a playback of trial testimony during jury deliberations is a critical stage of the trial that triggers a criminal defendant's fundamental right to be present.

In resolving this issue, we begin with the observation that a playback proceeding is initiated when the jury asks to rehear certain testimony and the court responds

by either granting or denying the request. If the request is granted, the trial continues, and the testimony is played back. The distinction between the request for a playback and the playback itself is significant from a legal standpoint because a criminal defendant's opportunity to defend against the charges may be affected in different ways depending on which part of the proceeding is challenged.

In the present case, the defendant does not challenge the first part of the proceeding. Although the record is silent on the matter, it appears that the defendant was present when the jury sent the note to the court requesting the playback and when the court decided, without objection by either counsel, to begin the playback on July 26, to permit note taking by the jurors, and to continue the playback two days later.[9] The defendant also does not challenge any part of the court's communications with counsel on August 4, when the court decided to conduct the playback after discussing the matter with counsel and denying defense counsel's motion for a mistrial. Thus, it is the defendant's challenge to the *continuation* of the playback during his involuntary absence that is now before the court.

In considering whether the playback under these circumstances resulted in a constitutional violation, we

---

[9] Although this court never has decided the issue of whether a defendant's absence when the trial court responds to a playback request is a constitutional violation, we note that many jurisdictions that have considered the issue have concluded that it is and then have reviewed the violation for harmless error. See, e.g., *Fisher* v. *Roe*, 263 F.3d 906, 915–18 (9th Cir. 2001), overruled in part on other grounds by *Payton* v. *Woodford*, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003), rev'd on other grounds sub nom. *Brown* v. *Payton*, 544 U.S. 133, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005); *Shewfelt* v. *Alaska*, 228 F.3d 1088, 1090–92 (9th Cir. 2000); *State* v. *Hannagan*, 559 P.2d 1059, 1063–66 (Alaska 1977); *People* v. *Auman*, 67 P.3d 741, 765–66 (Colo. App. 2002), rev'd on other grounds, 109 P.3d 647 (Colo. 2005); *Key* v. *State*, 760 So. 2d 278, 278–79 (Fla. App.), review denied, 779 So. 2d 271 (Fla. 2000). We need not reach that issue in the present case, however, because the defendant has not challenged the trial court's initial decision to grant the jury's request for the playback of trial testimony.

initially note that a playback is simply a reiteration of testimony that the jury already has heard in the defendant's presence. Thus, a playback is a relatively straightforward, mechanical procedure that requires no substantive decisions implicating the defendant's opportunity to defend. Although potential distractions may occur during the playback, such as interruptions by individual jurors, the jury's request to end the playback before it is completed, unauthorized talking among the jurors and a reading of the testimony in a less than neutral manner; see, e.g., *State* v. *Brown*, 362 N.J. Super. 180, 187, 827 A.2d 346 (App. Div. 2003); none of these distractions directly affects the opportunity of the defendant to influence the proceeding in a substantive manner. Thus, the defendant is relegated, for all practical purposes, to the status of a passive listener.

The defendant nevertheless claims that the playback of testimony from "two crucial witnesses in a trial that came down to credibility constituted a critical stage of the proceedings that required [his] presence" to ensure the fairness of the proceedings. The defendant argues that the jurors must have been wondering why he was not present and, furthermore, that they were unable to observe his gestures or facial expressions while the testimony was being replayed. We are not persuaded. The court instructed the jury that it was not to draw any negative inferences from the defendant's absence and that no information had come to its attention indicating that he was in violation of any court orders. In addition, the jurors already had been able to observe the defendant's demeanor at trial during his own testimony and that of the victim. Finally, the defendant's demeanor during jury deliberations was not evidence that the jury should have considered because the evidence phase of the trial had been completed. Thus, the playback alone, apart from the communications that preceded it between the court and the jury, was not a critical stage

of the proceedings that would have required the defendant's presence.

In *Snyder* v. *Massachusetts*, 291 U.S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934), the United States Supreme Court upheld the trial court's decision to deny the petitioner permission to accompany counsel and the jury on a trip to view the crime scene, stating that "[n]owhere in the decisions of this court is there a dictum, and still less a ruling, that the [f]ourteenth [a]mendment assures the privilege of presence when presence would be useless, or the benefit but a shadow." Id., 106–107. "There is nothing [that the defendant] could do if he were there, and almost nothing he could gain." Id., 108. Similar logic applies in the present case. The defendant's mere presence during the playback would not have been useful because there was nothing he could have done that would have contributed to his defense.[10] Accordingly, we conclude that the playback of the testimony was not a critical stage of the trial, the defendant's constitutional right to be present was not violated because of his involuntary absence during the playback, and the trial court did not abuse its discretion in denying defense counsel's motion for a mistrial.

The defendant argues that numerous federal and state cases support his claim that he had a right to be present during the playback unless he waived it voluntarily. Each of these cases, however, is distinguishable on their facts. See *Rogers* v. *United States*, 422 U.S. 35, 39, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975) (defendant had right to be present and should have been granted opportunity to be heard before trial judge responded to jury note asking if court would accept verdict); *United*

[10] Although the defendant contended at oral argument before this court that he should have been present because the jurors might have interrupted the playback to ask the court a question, we need not consider such a circumstance because there is no evidence to indicate that it happened in this case.

*States* v. *Toliver*, 330 F.3d 607, 611 (3d Cir. 2003) (defendant had right to be present during jury deliberations when court responded to jury's question), cert. denied, 540 U.S. 1185, 124 S. Ct. 1405, 158 L. Ed. 2d 90 (2004); *United States* v. *Torres-Palma*, 290 F.3d 1244, 1247–48 (10th Cir. 2002) (defendant had right to be physically present during sentencing, and sentencing by way of video conference was per se prejudicial); *United States* v. *Rhodes*, 32 F.3d 867, 874 (4th Cir. 1994) (defendant had right to be present during in-chambers discussion with counsel for government and defense regarding substantive question from deliberating jury concerning jury instructions), cert. denied, 513 U.S. 1164, 115 S. Ct. 1130, 130 L. Ed. 2d 1092 (1995); *United States* v. *Parent*, 954 F.2d 23, 24–25 (1st Cir. 1992) (note from jury pertaining to ongoing deliberations should have been fully disclosed to counsel when received so that counsel could be heard before judge makes decision); *United States* v. *Florea*, 541 F.2d 568, 570–71 (6th Cir. 1976) (defendant "arguably" had right to be present when jury requested replay by government witness of tape recordings of intercepted conversations), cert. denied, 430 U.S. 945, 97 S. Ct. 1579, 51 L. Ed. 2d 792 (1977); *Cruz* v. *United States*, United States District Court, Civil Docket No. 04-2422(HL), 2005 U.S. Dist. LEXIS 18300, *12 (D.P.R. June 29, 2005) (defendant had right to be present when jury was recalled for supplementary instructions after deliberations were underway); *State* v. *Shewfelt*, 948 P.2d 470, 473 (Alaska 1997) (defendant had right to be notified personally of jury's playback request, but error was harmless beyond reasonable doubt because nothing suggested defendant's absence from playback was "unusual").

The foregoing cases are inapposite because they involve a defendant's right to be present during communications between the court and the jury at the time of the original playback request or during other parts of the trial such as the jury instructions or sentencing. In

contrast, the defendant in the present case claims that he had a right to be present during the playback of testimony, *after* the trial court had responded to the jury and *after* counsel had agreed to the playback. Moreover, to the extent that *Shewfelt* is applicable, it is consistent with our reasoning because the court in that case concluded that, although the defendant had a right to be notified of the playback request, the error was not harmful because nothing during the playback was unusual or suggested that the defendant's absence was unusual.[11] *State* v. *Shewfelt*, supra, 948 P.2d 473. Accordingly, we reject the defendant's claim that the foregoing cases should be followed.

B

The defendant also claims that the trial court abused its discretion in denying the motion for a mistrial because it improperly failed to comply with the rule of practice providing that the defendant "must be present at the trial" unless the court finds that he is represented by counsel and that he has voluntarily waived the right to be present. Practice Book § 44-8; see also Practice Book § 44-7. The defendant concedes that this claim is unpreserved but seeks review under the plain error doctrine. See Practice Book § 60-5. We disagree that the court's failure to follow the rules of practice constituted plain error.

The plain error doctrine, which is "codified at Practice Book § 60-5,[12] is an extraordinary remedy used by

---

[11] We recognize, however, that a defendant's right to be present may be implicated when a jury communicates with the court regarding the playback after it has begun.

[12] Practice Book § 60-5 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009).

Practice Book § 44-7 provides in relevant part: "The defendant has the right to be present at the arraignment, at the time of the plea, at evidentiary hearings, at the trial, and at the sentencing hearing, except as provided in Sections 44-7 through 44-10. . . ." Practice Book § 44-8 provides in relevant part: "The defendant must be present at the trial and at the sentencing hearing, but, if the defendant will be represented by counsel at the trial or sentencing hearing, the judicial authority may . . . (1) [e]xcuse the defendant from being present at the trial or a part thereof or the sentencing

hearing if the defendant waives the right to be present
. . . [or] (2) [d]irect that the trial or a part thereof or
the sentencing hearing be conducted in the defendant's
absence if the judicial authority determines that the
defendant waived the right to be present . . . ."

We conclude that the defendant's absence during the
playback of the trial testimony does not require reversal
under our rules of practice. As we stated in *State* v.
*Myers*, supra, 290 Conn. 278, "[a] trial court's failure to
comply with a rule of criminal procedure, without more,
is insufficient to require reversal for plain error. See,
e.g., *State* v. *Suggs*, 194 Conn. 223, 226–27, 478 A.2d
1008 (1984) ([n]ot every deviation from the specific
requirements of a [rule of practice] necessitates rever-
sal); cf. *State* v. *Fernandez*, 254 Conn. 637, 647, 758 A.2d
842 (2000) (violation of rules of practice not ground
for reversal when defendant was not deprived of his
constitutional rights), cert. denied, 532 U.S. 913, 121 S.
Ct. 1247, 149 L. Ed. 2d 153 (2001)." (Internal quotation
marks omitted.) *State* v. *Myers*, supra, 290–91. For all
of the reasons discussed in part I A of this opinion, we
conclude that the defendant did not have a constitu-
tional right to be present when the jury listened to the
playback. Furthermore, the defendant has not demon-
strated that his absence during the playback "affect[ed]
the fairness and integrity of and public confidence in
the judicial proceedings." (Internal quotation marks
omitted.) Id., 289. Accordingly, the trial court did not
abuse its discretion in denying the motion for a mistrial.

II

The defendant next claims that he was deprived of
his right to a fair trial because the prosecutor made
numerous improper comments during closing argu-
ment. The defendant specifically claims that the prose-
cutor improperly appealed to the emotions of the jurors,

told the jurors that they could consider sympathy in reaching their verdict, incorrectly stated the principles for finding facts and their relationship to proof beyond a reasonable doubt, and diluted the burden of proving the elements of the crimes beyond a reasonable doubt. The defense did not object to the claimed improprieties at the time that they allegedly occurred. The state responds that most of the prosecutor's comments were not improper and that, to the extent that they were, the defendant was not deprived of his right to a fair trial. We agree with the state.

The governing legal principles are well established. "[A] claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . .

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper.

. . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–79, 961 A.2d 975 (2009). We address each of the alleged improprieties in turn.

### A

### Appeal to the Jurors' Emotions

The defendant first claims that the prosecutor improperly appealed to the jurors' emotions when he reminded them on several occasions that the victim was a child because (1) she had to be "helped up into the [witness] chair," she had to be " 'scooched' forward a little bit to reach the microphone" and "her feet were dangling from the edge of the chair" when she testified at trial, (2) she "laughed" when she was asked about going for a ride in the defendant's car and testified that she "thought this was going to be a fun situation, going around the block, being in the car with [the defendant but that] [i]t didn't turn out that way," and (3) she was not "sophisticated enough to put a spell on each and every one of [the jurors]." He also claims that the prosecutor appealed to the jurors' emotions when he, in effect, castigated the defendant for exercising his right to have a jury trial by referring to the fact that the case had gone "full course . . . ." We disagree.

It is well established that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omit-

ted.) *State* v. *Warholic*, 278 Conn. 354, 376, 897 A.2d 569 (2006).

1

We first consider the prosecutor's references to the victim's physical demeanor when she testified at trial. In discussing the victim's credibility, which was challenged by the defense, the prosecutor argued to the jury as follows in summing up the state's case: "Something happened to her in that car, and the defendant and his girlfriend come in here and try to put a different spin on it. You don't need to look any further than that young girl who came in here and testified, basically, someone that had to be helped up into the [witness] chair and had to be 'scooched' forward a little bit to reach the microphone. I'm sure her feet were dangling from the edge of the chair right there. That's the person who provided you with the information in terms of what happened here. Nothing that's been presented to you would show what motive she would have to make this story up and what would motivate her to not be anything—to testify in the manner that she did. Everything else is just pure speculation."

"Our law is well settled that it is a jury's duty to determine the credibility of witnesses and to do so by observing firsthand their conduct, demeanor and attitude." *State* v. *Johnson*, 288 Conn. 236, 265, 951 A.2d 1257 (2008). The victim's behavior while she was testifying was not only visible to the jurors but was properly before them as evidence of her credibility. Although the prosecutor's comments may have drawn attention to her youth, the defendant does not claim that they were inaccurate. Moreover, viewed in context, it is clear that the comments were part of the prosecutor's argument that the victim would have had no motive to be untruthful about what had happened *because* of her youth and innocence. Furthermore, the comments

were neutral in tone, did not represent the prosecutor's personal opinion about the victim and did not portray the victim in an especially flattering light, which might have led the jurors to decide the case on the basis of irrelevant factors. But cf. *State* v. *Warholic*, supra, 278 Conn. 376–77 (concluding that prosecutor's reference to victim as "cute little kid" was improper because it represented prosecutor's personal opinion as to victim's appearance at time of alleged sexual assault and had no bearing on credibility or any factual issue in case, and only purpose of remark could have been to encourage jurors to sympathize with victim [internal quotation marks omitted]). Accordingly, we conclude that the prosecutor's comments regarding the victim's demeanor while she was testifying were not improper.

2

With respect to the prosecutor's reference to the victim's laughing or giggling when she testified about driving the defendant's car, defense counsel asked the victim on cross-examination if she had a driver's license and if she knew how to drive, but the record does not reveal her demeanor when she responded to these questions.[13] The victim also testified that she liked to ride in the defendant's car and that he had been nice to her before the incident. The prosecutor then incorporated this testimony in his closing argument as follows in discussing the victim's credibility: "[The victim] gets in that car, and she laughed when asked do you have a license? Can you drive a car? She giggled at that, and she said no. A simple task that she wanted to go with somebody that she respected, somebody that she looked up to, so to speak, that she thought this was

---

[13] "[Defense Counsel]: Now, you said that you got in the car and that you were driving. You don't have a driver's license, right?
"[The Victim]: No.
"[Defense Counsel]: Okay. And you don't really know how to drive, right?
"[The Victim]: I know how to drive but a little bit."

going to be a fun situation, going around the block, being in the car with him. It didn't turn out that way. Something happened to her in that car, and the defendant and his girlfriend come in here and try to put a different spin on it."

We conclude that the prosecutor's description of the victim's demeanor when she testified about driving the defendant's car and his argument that the victim had thought that going for a ride would be "fun" but that "[i]t didn't turn out that way," were not improper. The prosecutor's comments did not inject emotion into the proceedings but demonstrated that the eight year old victim was aware of what constituted appropriate conduct, which was crucial in determining whether her accusations that the defendant had engaged in improper conduct were truthful. Thus, pointing out that the victim laughed and giggled when questioned about having a driver's license and knowing how to drive indicated her awareness that she was too young to have a license and too young to drive. Similarly, arguing that the victim thought that going for the ride would be "fun" but that "[i]t didn't turn out that way" was both a statement of fact and a way of emphasizing that her innocent expectations when she got into the car were appropriate, even if they had turned out to be wrong. Moreover, the prosecutor was referring to evidence already before the jurors, namely, that the victim was young at the time of the incident, that she had testified that the defendant was nice and that she liked to ride in his car, all of which were directly relevant to her decision to go for a ride with the defendant and to the charges of risk of injury to a child that ultimately were brought against him. We therefore conclude that the prosecutor's comments were not improper.

3

The prosecutor's comment that the victim was not "sophisticated enough to put a spell on each and every

one of [the jurors]," like all of the other disputed comments, was made in the context of an argument concerning her credibility. The prosecutor specifically declared, when speaking about the victim: "She marched through that door. She took the stand. She had to be moved up a little bit so she could reach the microphone. And then she talked about certain things that she remembered occurred in that car back in June of 2003. Does she appear sophisticated enough to put a spell on each and every one of you? I mean, I know things were pointed out through some of the witnesses about things that were going on at the house, things that were said, reasons why people shouldn't be with other people. But you had a young girl come in here and testify about what took place in the car. And what you have to assess is not only her credibility, but all the witnesses that were presented in this case."

We conclude that the prosecutor's comment about the victim's inability to put "a spell on each and every one of [the jurors]" was not improper. The use of an analogy as a rhetorical device to make a point in closing argument is not prohibited. The comment did not conjure up inappropriate images of fantasy figures and mysterious spells but was made in the context of a discussion of the victim's straightforward demeanor. It also was intended to emphasize the simplicity and innocence of her youth, in contrast to the possible lack of truthfulness on the part of the defendant and other adult witnesses whose testimony may have cast doubt on the victim's account of the incident.

4

The defendant also claims that the prosecutor appealed to the jurors' emotions and unfairly penalized him for exercising his right to a have a jury trial when he referred to the fact that the case had gone "full course . . . ending up before you as jurors to decide

the fate of the defendant." The prosecutor made the comment early in his argument in discussing the jurors' task of assessing the credibility and demeanor of the witnesses. The prosecutor specifically argued: "[W]hat you have to consider is what motivates people to come into court to testify. What reasons, what do they have to gain, what interest do they have in the outcome?" After referring to the obvious interest of the defendant, he noted the victim's youth and lack of sophistication, and discussed the fact that the victim had not reported the incident immediately. He also reviewed testimony by the defendant and several family members indicating that the victim and the defendant had "got[ten] along" before the incident, and then posed the following rhetorical question: "[W]hat would motivate this young girl to act in the way she did, in describing the . . . events that occurred in that car in the evening hours of early June of 2003, in keeping it to herself for a three day period of time, and then eventually telling her mom, and then eventually the case going the full course and ending up before you as jurors to decide the fate of the defendant?" The prosecutor later argued to the jury: "You have to assess the entire case, every[thing] that was presented to you, both from the state's side and the defense's side. You have to judge them fairly, equitably across the board. . . . [A]ll of us have inside the ability to assess credibility, sizing someone up. As I told each and every one of you, you have to size them up."

Viewed in this context, the prosecutor was not appealing to the jurors' emotions or castigating the defendant for insisting on a jury trial but was advising the jurors of their responsibility to assess the credibility of the victim fairly and equitably in light of all of the evidence, not merely the evidence that might cast doubt on her truthfulness. Because the argument was rational, not emotional, and was directed principally to the jury's

function of determining the credibility of the witnesses, we conclude that the defendant's claim has no merit.

## B

### Appeal to Sympathy in Assessing Credibility

The defendant's next claim is that the prosecutor improperly stated that the jurors could consider "feeling sorry" for other people in assessing the credibility of the witnesses. We agree that this comment was improper.

During rebuttal argument, the prosecutor declared that defense counsel had expressed personal opinions, alluded to facts not in evidence and offered assessments of the credibility of particular witnesses, all of which had been improper. The prosecutor noted that he had objected to certain portions of defense counsel's argument and thereafter advised the jurors as follows: "Issues about feeling sorry for particular people, assessing their believability, the manner in which they presented to you, are things that you're to consider. You're to use your everyday tools in assessing credibility in this case." In a subsequent portion of his argument, however, the prosecutor stated that "[s]ympathy is to play no part in your deliberations. . . . You have a duty and an obligation . . . that if the facts and the law dictate a guilty verdict, you must return that guilty verdict. And it must be found and it must be based on the facts and the law."

Defense counsel did not object when the prosecutor told the jurors that they could consider "feeling sorry" for particular people, nor did he request a curative instruction to mitigate any potential harm. The trial court subsequently instructed the jury: "Your verdict must not be influenced by sympathy. It is not within your province to determine, nor may you be affected by, the consequences of your verdict upon the accused or his family. You must, with your duty unswayed by

sentiment or emotion, determine your verdict by a careful consideration of the facts disclosed by the evidence and the application of the relevant law to those facts."

The defendant's argument that the prosecutor improperly told the jurors that they could consider "feeling sorry" for other people in considering whether the defendant was guilty is simply another way of claiming that the prosecutor appealed to the jurors' emotions.[14] As this court previously has stated, "[i]t is well settled that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 462, 797 A.2d 1088 (2002).

We conclude that the prosecutor's comment was improper because the message it conveyed to the jurors was that they could allow emotional factors to influence their assessment of the credibility of witnesses. The language was clear and direct and not open to interpretation. The fact that the prosecutor subsequently told the jurors that they could not be influenced by sympathy in reaching their verdict does not erase the fact that the earlier statement was made. Moreover, the state concedes that the comment was improper. We therefore review this impropriety in part II E of this opinion to determine whether it was harmful.

## C

### Misstatement of the Law

The defendant's next claim is that the prosecutor misstated the law regarding the jury's determination

---

[14] "Sympathy" is defined in relevant part as "[a] relationship or an affinity between people or things in which whatever affects one correspondingly affects the other. . . ." American Heritage Dictionary of the English Language (3d Ed. 1992).

of the facts and what needed to be proved beyond a reasonable doubt. He claims that the prosecutor repeatedly told the jury that the state did not have to prove facts and that it did not have to prove facts beyond a reasonable doubt. He also claims that the trial court did not provide an instruction cautioning the jury to disregard the prosecutor's misstatements. We disagree with the defendant's claim.

The state made the following argument during rebuttal: "As was mentioned, we do have an obligation to prove this case beyond a reasonable doubt. And that obligation involves proving the elements beyond a reasonable doubt. We don't have to prove facts to you beyond a reasonable doubt. Facts are elicited from the witnesses. Their spoken word in this case provides you, for the most part, with all the facts that you need. You have some physical evidence here, stuff that you can look at . . . but a lot of that is backed up by the spoken word and what other witnesses have to say. We don't necessarily—we don't have to prove facts."

This court has determined that "the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

We conclude that, although the better practice would have been for the prosecutor to give a fuller description of the jury's duty in accordance with the applicable legal principles; see id.; the prosecutor's argument was not technically incorrect. After explaining that the state was required to prove the *elements* of the charged offenses beyond a reasonable doubt, he added that the state was not required to prove the *facts* beyond a reasonable doubt. These remarks were entirely consistent with the law even though they were not a model of clarity in directing the jury as to how it should view the evidence.

## D

### Diluting the Burden of Proof

The defendant's next claim is that, because the prosecutor argued that the jury could rely solely on the victim's testimony to find the defendant guilty without explaining that her testimony had to satisfy all of the elements of the crime beyond a reasonable doubt, he improperly conveyed the impression that the state had a lesser burden of proof than that required to find the defendant guilty of the charged offenses. We disagree.

The prosecutor stated the following in arguing that the jury could rely on the testimony of the victim alone to find the defendant guilty: "Now, one of the things you have to keep in mind . . . [is that] the court may instruct you that the testimony of one witness alone, the testimony of only one witness, is sufficient to convict. Just one witness. So, if you were to bring [the victim] in here and have her take the stand and talk about what occurred back in June of 2003, sit here, identify her shorts, say those were [her] shorts, get up, walk out the door, [defense counsel] and myself stand up, no other witnesses, you could convict the defendant if you believe the information that she passed on to

you and if it satisfied all of the elements of the crimes charged."

We conclude that the prosecutor's comments were not improper. The fact that the prosecutor omitted the phrase "beyond a reasonable doubt" in connection with his statement that the jury could find the defendant guilty if it believed the testimony of the victim alone and if it determined that her testimony satisfied all of the elements of the crimes charged is of little or no significance. The prosecutor referred to the fact that the state must prove the elements of the crimes charged beyond a reasonable doubt at least six other times during his closing argument. In fact, the defendant relies on such language in claiming prosecutorial impropriety with respect to another portion of the prosecutor's closing argument, in which the prosecutor stated: "As was mentioned, we do have an obligation to prove this case beyond a reasonable doubt. And that obligation involves proving the elements beyond a reasonable doubt." (Internal quotation marks omitted.) Part II C of this opinion. Finally, the prosecutor did not misstate the burden of proof or tell the jurors that the state did not have to prove the elements of the crimes charged beyond a reasonable doubt. Accordingly, the prosecutor's argument was not improper merely because he did not refer to the burden of proof more often or in relation to the fact that the jury could find the defendant guilty on the basis of the victim's testimony alone.

## E

### Right to a Fair Trial

Having concluded in part II B of this opinion that the prosecutor improperly appealed to the jurors' emotions during closing argument when he stated that they could consider "feeling sorry" for other people in assessing the credibility of the witnesses, we next must consider whether this impropriety was so harmful that it

deprived the defendant of his constitutional right to a fair trial. The defendant argues that the comment was harmful because it was not invited by the defense, it related to a central issue in the case, namely, the credibility of the victim and the defendant, it was not mitigated by the trial court's curative instructions, and the state's case against the defendant was hardly overwhelming. The state responds that the comment was inadvertent, was not addressed to any particular person, was only one phrase in a rebuttal argument that spanned sixteen pages of transcript, was not repeated, and, to the extent that it was construed by the jurors to apply to the victim's testimony, her testimony was corroborated by other evidence. We agree with the state.

"To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . .

"In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"[T]he determination of whether a new trial or proceeding is warranted depends, in part, on whether

defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial. . . . [T]he fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould*, supra, 290 Conn. 77–79.

We conclude that the defendant was not deprived of his right to a fair trial. We acknowledge that the prosecutor's comment was not invited by the defense and that it had the potential to affect the jury's determination of the victim's and the defendant's credibility, a central issue in the case. Other considerations, however, strongly militate against a finding of reversible error. These include the fact that the comment was inadvertent and was not specifically directed to any particular person. In addition, the prosecutor made no other improper comments during his closing argument, and the comment was mitigated, to some extent, by the prosecutor himself when he later stated that sympathy was to play no part in the jury's deliberations.

Moreover, defense counsel did not object when the comment was made or ask the court for a curative instruction. Thus, the defense apparently did not perceive at the time that the comment was so prejudicial that it deprived the defendant of a fair trial. Furthermore, the trial court specifically cautioned the jurors that they "must *not* be influenced by sympathy. . . . You must, with your duty unswayed by sentiment or emotion, determine your verdict by a careful consideration of the facts disclosed by the evidence and the

application of the relevant law to those facts." (Emphasis added.) Thus, the trial court's instruction on the role of emotion in the jurors' decision largely cured any potential harm that might have been caused by the prosecutor's improper comment.

The only remaining consideration is the strength of the state's case, which requires exposition of the following additional facts. In the course of its investigation, the police seized the shirt, shorts and underwear that the victim had been wearing when the incident occurred. The shirts and shorts were still in the hamper where the victim had left them after taking them off, and the victim's mother provided the police with the underwear. All of the items were later tested for evidence of blood, semen and other bodily fluids. Karen J. Lamy, a criminalist at the state forensic science laboratory, testified that she had examined the clothing and found possible evidence of blood in the crotch of the victim's underpants, which was too weak to test, and a small semen stain inside the crotch of the shorts. She did not find any semen on the outside of the shorts. Lamy testified that, in her opinion, the semen had come from a wet source. She acknowledged, however, that if another piece of clothing with wet semen on it had been thrown in the same hamper and had made contact with the victim's shorts, some of the semen from the other clothing could have been transferred to the shorts. Nicholas Yang, a supervisor at the state forensic science laboratory who conducted DNA testing on the shorts, testified that, in his opinion, the defendant was the source of the semen. He also testified that the semen sample contained epithelial cells from the defendant's girlfriend.

The defendant's girlfriend, an older half sister of the victim who had been living in foster care for many years but who still visited her mother often, testified for the defense that the semen stain may have been transferred

to the victim's shorts through contact with other clothing. She specifically testified that, earlier on the day of the assault, or maybe a couple of days before, she had visited the home of her mother and the victim. She testified that, while she was there, she had had sexual intercourse with the defendant in a room in the back of the house where her mother and the victim normally slept, and that she and the defendant might have used some of the clothing that was lying around the room to clean themselves up. Afterward, she left with the defendant and went to his house before returning later that evening to her mother's house. She conceded, however, that she was not entirely certain whether she and the defendant had had sexual intercourse at her mother's house on the same day that he took the victim for the ride.

Thereafter, the defendant testified that, on the day that he took the victim for a ride, he had had sexual intercourse with his girlfriend at her mother's house. They eventually left the house, but the defendant returned to the house alone to give the mother a message from his girlfriend. Upon arriving at the mother's house, the defendant beeped his horn, and the mother came out with the victim and a grandson from one of her other children. The victim suddenly opened the driver's side door and tried to squeeze in between the defendant and the steering wheel, but there was not enough room. He therefore pushed his seat back, and she sat down and started playing with the turn signals, radio, windshield wipers and keys in the ignition. Because the victim was pestering the defendant to take her for a ride, which he did not want to do, he finally relented, with the mother's approval, and told the victim to get into the passenger seat. The defendant then drove the car around the block while the victim played the radio and sang along with the music. When they returned, the victim thanked him and said goodbye. The

defendant said the ride took between two and one-half and four minutes, and that nothing inappropriate or of a sexual nature had happened.

During closing argument, defense counsel spoke about the credibility of the various witnesses, including the victim and the defendant, noting possible inconsistencies and weaknesses in their testimony. In discussing the testimony of Lamy, Yang and the defendant's girlfriend, he theorized in part that the semen stain could have been transferred to the victim's shorts through contact with other dirty laundry in the room where the defendant and his girlfriend had had intercourse on the day that the defendant had taken the victim for a ride.

The defendant argues that the state's case against him was not overwhelming because it involved a credibility contest between him and the victim. He contends that, although there was DNA evidence that arguably incriminated him, namely, the semen stain on the victim's shorts, the stain easily could have been explained by his and his girlfriend's testimony that they had had sexual intercourse on the bed where the victim slept. The state responds that other factors corroborated the victim's testimony, the most important being the DNA evidence indicating that the semen stain on her shorts had been traced to the defendant. We agree with the state.

Although the credibility of the defendant and the victim was a key issue in the case, the DNA evidence was significant confirmation of the victim's testimony. The defendant's argument that the semen stain could have been transferred to the victim's shorts through contact with other dirty clothes in the room in which the victim slept was severely undermined by his girlfriend's testimony that she was not certain if she and the defendant had had sexual intercourse in the house earlier

that day or on another day. Accordingly, we conclude that the state's case was reasonably strong, and, because several other *Williams* factors also favor the state, we reject the defendant's claim that the prosecutor's improper comment deprived him of his right to a fair trial.

The judgment is affirmed.

In this opinion the other justices concurred.

