## STATE OF CONNECTICUT *v.* BRIAN T. FRANCIONE, JR.
### (AC 32820)

Gruendel, Lavine and Sheldon, Js.

---

Argued January 12—officially released June 19, 2012

*Deborah G. Stevenson,* special public defender, for the appellant (defendant).

*Michele C. Lukban,* senior assistant state's attorney, with whom, on the brief, was *Kevin D. Lawlor,* state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Brian T. Francione, Jr., appeals from the judgment of conviction, rendered following a jury trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (1). On appeal, the defendant claims that (1) the trial court improperly denied his motions for a judgment of acquittal because the evidence was insufficient to establish that the fire was set intentionally and that the defendant was the individual who set the fire, and (2) prosecutorial improprieties during closing arguments deprived the defendant of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In April, 2008, the defendant was eighteen years old, a junior in high school and a member of the Junior Firefighters in Ansonia. The Junior Firefighters consisted of individuals between fourteen and eighteen years old who provided assistance to the Ansonia volunteer fire department at fire scenes.[1] Thomas Langrieger, Jr., who was fourteen years old at the time, also was a member of the Junior Firefighters. Langrieger and the

---

[1] The Junior Firefighters received basic firefighting training and practiced drills approximately twice per month. They assisted the Ansonia fire department by carrying tools on and off the trucks and hooking up the hoses to fire hydrants, among other responsibilities.

defendant were close friends who often would spend the night at one another's houses.

On April 14, 2008, the defendant stayed at Langrieger's house. Langrieger lived with his parents at 14 Jarvis Drive, which is approximately nine houses away from where the defendant lived with his parents on Benz Street.[2] After watching movies with Langrieger's father and sister, the defendant and Langrieger went into the garage to "hang out" at approximately 11:45 p.m. The defendant stated that he needed clothes, exited the garage and walked behind the house, where he filled an empty Gatorade bottle with gasoline from a leaf blower. The defendant told Langrieger that he needed the gasoline for his father, who was a volunteer firefighter with the Ansonia fire department. The defendant then left Langrieger's house and walked down Jarvis Drive toward Martin Terrace,[3] which intersects with Jarvis Drive and is parallel to Benz Street.

Approximately ten to twenty minutes after the defendant left Langrieger's house, Langrieger went outside and saw the defendant jogging toward the house while holding a bag. Langrieger could see that there was a fire down the street because "the whole street was glowing up orange." The defendant told Langrieger that he lit the fire "because there hasn't been a structure fire lately . . . ." Langrieger and the defendant then heard the tone from Langrieger's pager announcing a fire at 21 Martin Terrace, which is approximately seven

[2] Langrieger testified that typically it would take him three minutes to walk from his house to the defendant's house.

[3] Langrieger testified that he saw the defendant meet someone near the intersection of Jarvis Drive and Martin Terrace. Langrieger further testified that the defendant stated that the person he met with was "Chris." Langrieger believed the defendant's reference to "Chris" was Chris Tartaglia, another youth who lived in the neighborhood. Langrieger also testified that Tartaglia threatened to kill Langrieger and burn his house down if he did not stop telling people that Tartaglia set the fire at 21 Martin Terrace. Tartaglia accused Langrieger, as well as the defendant, of spreading this rumor.

houses away from Langrieger's house. The defendant left Langrieger's house and ran toward the fire, where he met his father and grabbed his fire gear from the back of his father's car. Langrieger woke his father and sister and arrived at the fire with them five or ten minutes later.

At approximately midnight, Christopher Flynn, a sergeant in the Ansonia police department, received a call that there was a fire on Martin Terrace. He arrived at 21 Martin Terrace and observed a fire on the exterior wall of the garage attached to the house. Flynn banged on the front door and awoke the homeowner, Patrick DiCantio, informing him that his house was on fire and that he needed to evacuate. After DiCantio exited the house, Flynn checked the interior for more occupants. He looked into the garage, where he observed flames in the front far corner "starting to creep up the wall" and "roll toward the ceiling." As Flynn was getting DiCantio out of the house, other emergency personnel began to arrive at the scene, including Ralph E. Tingley, the fire marshal for Ansonia. Tingley observed that the fire was burning almost the entire exterior side wall of the garage. In total, approximately forty firefighters responded to the fire.[4]

The firefighters eventually gained control of and extinguished the fire. The fire burned through the siding, insulation and sheathing of the side wall of the garage, destroying much of the garage. After the fire was extinguished, but before it was cleaned up, Langrieger and his family returned to their house and went to bed. The defendant returned to Langrieger's home sometime thereafter and talked with Langrieger. The

---

[4] Joseph Kingston, an assistant fire chief in the Ansonia fire department, testified that the reason there were so many firefighters at the Martin Terrace fire was because "everybody comes out" for "structure fires." He further testified that Ansonia typically has about two structure fires each year.

defendant again admitted that he had lit the fire "because there hasn't been a structure fire lately . . . ."

The next morning, on April 15, 2008, the defendant visited with Samantha Morisseau, with whom he was romantically involved,[5] and Nicole Perez, Morisseau's best friend, at Morisseau's house.[6] Morisseau received a call from Langrieger, who discussed the fire from the previous night. After getting off the telephone with Langrieger, Morisseau "asked [the defendant] if he knew anything about the fire because [she] heard that he started it . . . ." The defendant responded that he had started the fire "because Ansonia fire department has not had a lot of structure fires lately . . . ." Later that night, Perez, Morisseau and the defendant were at Morisseau's house when Morisseau received a telephone call from James Blaskewicz. Morisseau went inside to converse with Blaskewicz and left the defendant and Perez outside on the porch. While inside, Morisseau overheard the defendant and Perez talking about the fire, put the telephone down and asked the defendant if he started the fire. The defendant responded that he had started the fire.

On May 7, 2008, Morisseau, Perez, Langrieger and the defendant were socializing at Morisseau's house when John Rafalowski, a detective in the Ansonia police

[5] Morisseau testified that she and the defendant began dating "a couple of days before the fire," broke up for "the first time [on] the night of the fire" and continued to date "off and on" until sometime in 2009, when the relationship ended "for good."

[6] Morisseau, who was sixteen years old at the time, lived with her parents at 26 Martin Terrace, which is about two houses away from 21 Martin Terrace. Morisseau's father also was a volunteer in the Ansonia fire department. On the night of the fire, Perez was staying at Morisseau's house when Morisseau's father's pager went off. Morisseau, her mother and Perez left the house and observed the fire, while Morisseau's father grabbed his gear and responded to the fire. Morisseau saw the defendant running from Jarvis Drive onto Martin Terrace, where he grabbed his gear from the back of his father's car.

department, and another detective arrived to discuss the fire with Morisseau. Upon seeing the police car, the defendant told the group to "be cool," his face turned red and he appeared nervous. Rafalowski asked Morisseau her age, and after she told him that she was sixteen years old, Rafalowski asked for the telephone number of her mother. After the detectives left, the defendant stated, "I bet [the police were] here because they think I started the fire." The defendant then stated that he had to go home and left Morisseau's house.

On another occasion, on or about May 7, 2008, Morisseau asked the defendant if he had started any other fires because there had been an additional fire on Wakelee Avenue in Ansonia subsequent to the fire at 21 Martin Terrace. The defendant responded that "the only fire he started was on Martin Terrace, that he swears to God he didn't start the Wakelee Avenue fire." Morisseau spoke with the defendant again on May 13, 2008. The defendant asked her if she had talked with the police, and Morisseau denied having done so.[7] Morisseau then asked the defendant for a fourth time whether he had started the fire. The defendant stated, "yes, but not the one on Wakelee Avenue."

On May 16, 2008, Rafalowski and Patrick Lynch, a detective sergeant in the Ansonia police department, interviewed the defendant at Ansonia High School. The defendant denied any involvement in starting the fire at 21 Martin Terrace. Lynch noticed, however, that when the conversation turned to the fire, the defendant appeared nervous.

Tingley, Ansonia's fire marshal, and Michael Grasso, a fire investigator for the homeowner's insurance company, conducted separate investigations of the fire at

___

[7] Morisseau had, in fact, talked with the police by this time. On May 9, 2008, she gave a statement to Rafalowski and another detective in the presence of her mother regarding the defendant's admissions.

21 Martin Terrace. Both individuals determined, after examining the burn patterns, that the fire began on the exterior side of the garage. They also excluded accidental or natural causes. Tingley and Grasso both determined, for example, that there were neither any problems with the electrical system nor anything else in the garage that could have ignited the fire and that there had been no thunderstorms on the night of the fire. They ultimately concluded that the fire had been set intentionally. No accelerants were found, however, in the debris tested by the forensic laboratory.

The defendant was charged with arson in the first degree in violation of § 53a-111 (a) (1), and a jury trial followed. At the close of the state's case, the defendant made an oral motion for a judgment of acquittal on the ground of insufficiency of the evidence. The court denied the motion. The defendant renewed his motion for a judgment of acquittal at the close of all of the evidence, and the court, again, denied the motion. On June 1, 2010, the jury found the defendant guilty of the arson charge. On August 6, 2010, the court sentenced the defendant to a total effective term of ten years of imprisonment and two years of special parole. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motions for a judgment of acquittal because the evidence presented at trial was insufficient to establish that the fire at 21 Martin Terrace was set intentionally and that the defendant was the individual who set the fire. Specifically, the defendant argues that the testimony of Tingley and Grasso, both of whom the court qualified as expert witnesses as to the cause and origin of the fire, was unreliable.[8] The defendant also

[8] The defendant asserts that "[n]either witness . . . was sufficiently qualified to make [the determination that the fire was set intentionally], nor could they present credible, objectively scientific evidence" regarding their conclusions, and, as such, their opinions were speculative. The defendant

argues that the testimony of Morisseau, Perez and Langrieger was "wholly insufficient to prove, beyond a reasonable doubt, that the defendant was culpable" because their testimony was inconsistent and not credible. Specifically, the defendant argues that Morisseau's testimony was "suspect, at best," because of her romantic relationship with the defendant.[9] The defendant asserts that Perez' testimony was unreliable because she claimed that she woke DiCantio and helped him across the street, which was contradicted by the testimony of Flynn and DiCantio. Additionally, the defendant argues that Langrieger's testimony was unreliable because it was inconsistent and because he was motivated "to name the defendant as the perpetrator" by Chris Tartaglia's threat to kill Langrieger and burn his house down if he did not stop telling people that Tartaglia set the fire at 21 Martin Terrace.[10] See footnote 3 of this opinion. We are not persuaded.

further contends that Tingley and Grasso conducted flawed investigations in that they failed to interview certain individuals, did not review certain evidence and inaccurately relied on burn patterns. Additionally, as to Grasso, the defendant argues that the crime scene had not been preserved prior to when Grasso viewed it. Although the defendant objected at trial to the qualification of the witnesses as experts, he does not claim on appeal that the court abused its discretion in qualifying the witnesses as experts; rather, he claims that their testimony, along with the testimony of Morisseau, Perez and Langrieger, was insufficient to establish the defendant's guilt beyond a reasonable doubt.

[9] The defendant characterizes Morisseau as "a spurned lover," citing testimony that she referred to the defendant as "her hubby" and herself as "wifey," and that she wrote the defendant a note on May 6, 2008, in which she expressed anger with the defendant for being insufficiently committed to her.

[10] During cross-examination of each witness, the defendant exposed the jury to all of the facts that allegedly undercut their credibility. We note that "it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Internal quotation marks omitted.) State v. Miles, 132 Conn. App. 550, 560, 32 A.3d 969 (2011), cert. denied, 303 Conn. 934, 36 A.3d 692 (2012).

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury [reasonably could have] concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict. . . . It is established case law that when a defendant challenges the sufficiency of the evidence, we apply a twofold test. We first review the evidence . . . in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn . . . the jury [reasonably could] have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Turner*, 133 Conn. App. 812, 842–43, 37 A.3d 183, cert. denied, 304 Conn. 929, 42 A.3d 390 (2012). "[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Coleman*, 304 Conn. 161, 166, 37 A.3d 713 (2012).

"[I]t is well settled that [w]hether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the

jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . [T]he [jury] can . . . decide what—all, none or some—of a witness' testimony to accept or reject. . . . [Q]uestions of whether to believe or to disbelieve a competent witness are beyond our review . . . . In addition, [e]vidence is not insufficient merely because it is conflicting or inconsistent. . . . A trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible. . . . [A]n appellate court does not retry the case or evaluate the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Andersen*, 132 Conn. App. 125, 143, 31 A.3d 385 (2011).

The jury was entitled to credit the testimony of Tingley, Grasso, Morisseau, Perez and Langrieger, which testimony adequately supports a finding that the defendant set the fire at 21 Martin Terrace with the intent to destroy or damage the building. See General Statutes § 53a-111 (a) (1).[11] Although intent usually is inferred through circumstantial evidence; *State* v. *Ramey*, 127 Conn. App. 560, 565–66, 14 A.3d 474, cert. denied, 301 Conn. 910, 19 A.3d 177 (2011); which can be just as probative as direct evidence; *State* v. *Lewis*, 303 Conn. 760, 768, 36 A.3d 670 (2012); this case presents the rare situation in which there is also direct evidence of the defendant's state of mind. Three different witnesses testified that the defendant admitted on multiple occasions not only that he set the fire, but that he did so because there had not been a structure fire in town

___

[11] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ." The defendant does not dispute that a fire occurred at 21 Martin Terrace or that the house was occupied at the time.

recently. This testimony, along with the other evidence—including the evidence that the defendant received firefighting training as a member of the Junior Firefighters and was observed walking toward Martin Terrace with a bottle of gasoline[12] on the night in question—was sufficient to support a finding that the defendant started the fire with the intent to destroy or damage the building. "Here, the defendant's claim, though labeled as a challenge to the sufficiency of the evidence, rests on an assessment of the witnesses' credibility." *State* v. *Moody*, 121 Conn. App. 207, 219, 994 A.2d 702, cert. denied, 297 Conn. 920, 996 A.2d 1193 (2010). Because "[w]e must defer to the [jury's] assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude," the defendant's claim must fail. (Internal quotation marks omitted.) Id.; see also *State* v. *Rojas*, 126 Conn. App. 352, 357, 15 A.3d 632, cert. denied, 301 Conn. 916, 21 A.3d 462 (2011), cert. denied,      U.S.    , 132 S. Ct. 1556, 182 L. Ed. 2d 184 (2012). Therefore, the court did not err in denying the defendant's motions for a judgment of acquittal.

II

The defendant next claims that the prosecutor engaged in certain improprieties during the state's rebuttal closing argument that deprived him of a fair trial. We conclude that, although some of the prosecutor's comments were improper, the defendant was not deprived of his due process right to a fair trial.

After setting forth the applicable principles of law, we address each of the alleged improprieties in turn and

[12] Although Langrieger testified on cross-examination that he did not see the defendant pour gasoline into the bottle, he testified that he "could tell [by looking at the bottle] that it was gas. Langrieger then agreed with the prosecutor that he "asked [the defendant] what he was doing with it." According to Langrieger, the defendant responded that "he needed it for his father," and then the defendant walked "down Jarvis [Drive] toward Martin [Terrace] and Benz [Street]."

then determine whether the sum total of the incidents found to constitute improper conduct deprived the defendant of a fair trial. "[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 595, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

The following standards guide our review of whether the prosecutor engaged in improprieties. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction

through the aid of passion, prejudice, or resentment." (Internal quotation marks omitted.) Id., 593–94.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Similarly, a prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 376, 897 A.2d 569 (2006). Additionally, "a prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 605. It is not improper, however, for a prosecutor appropriately to respond to statements made by defense counsel during the defendant's closing argument. See *State* v. *Brown*, 256 Conn. 291, 309, 772 A.2d 1107 ("[w]hen a prosecutor's allegedly improper argument is in direct response to matters raised by defense counsel, the defendant has no grounds for complaint" [internal quotation marks omitted]), cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); see also *State* v. *Singh*, 259 Conn. 693, 721, 793 A.2d 226 (2002) ("it was not improper for the state's attorney to use the same rhetorical device employed by defense counsel to underscore its theory of the case").

"In evaluating whether the [impropriety was so serious as to amount to a denial of due process], we consider the factors enumerated by [our Supreme Court]

in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Citation omitted.) *State* v. *Warholic*, supra, 278 Conn. 360–61. Although a defendant need not object at trial to the alleged improprieties, nor seek review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), "the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 361.

## A

The defendant first takes issue with the prosecutor's comments that Ansonia was a small town in which volunteer firefighters willingly risked their lives to save their neighbors and that the defendant "shattered" the peace of the town when he set the fire.[13] The defendant

[13] For clarity, the challenged portions of the comments are italicized. In context, the prosecutor's remarks were as follows: "*This is a case about a small town. It's a case about Ansonia, Connecticut, in the valley.* You've heard Sergeant Flynn and Detective Rafalowsky tell you it's a small police department. It's a volunteer fire department. I don't know if all those guys are eager to go out and risk their lives as counsel would like you to believe, but, it is, *it is a small fire department. And, what did all the evidence show? That this is a town where people come together to help their neighbors. All these witnesses talked about when this call came in, the tone going off. The tone, the tone, the tone, you heard the tone from a lot of these witnesses because that's what all these people are. They're just this guy's neighbors who came out that night, risked their lives to help their neighbor. And, on April, 15, 2008, just after midnight, the peace of that small town, Ansonia,*

argues that the size of the town, the caring attitude of the neighbors, and whether the peace of the town was "shattered" were not relevant factors in the case, and, as such, the challenged statements improperly were designed to arouse the emotions and sympathies of the jury. The state argues that "it is never improper for a trial prosecutor to comment on the evidence." Thus, according to the state, because it can be inferred from the evidence presented at trial that Ansonia was a small, caring town, the statements were not improper. The state also argues that the prosecutor was responding to the statements of defense counsel during the defendant's closing argument in which he referred to the fire as a "bonfire for the volunteer fire department of Ansonia" and "thus suggest[ed] that the fire was a festive, nonserious event."[14]

We reject the state's contention that comments supported by the evidence at trial and the inferences reasonably drawn therefrom "never" are improper.

_Connecticut, was shattered, shattered when that fire, that set fire, erupted on the side of Mr. DiCantio's garage at 21 Martin Terrace, and, when that tone went out, those volunteers came out._" (Emphasis added.) Shortly thereafter, defense counsel objected to the prosecutor's remarks as an improper "appeal to passion and sympathy . . . ." The court overruled the defendant's objection.

The defendant also challenges the following additional remarks made by the prosecutor later in the state's rebuttal closing argument: "_Now, in this small town of Ansonia, Connecticut, everybody volunteers when somebody's in trouble. Men and women of the Ansonia volunteer fire departments, you know, they're not getting paid. Hence, volunteer. They volunteer to run into those buildings when the Mr. DiCantios in the world are running out._" (Emphasis added.)

[14] During the defendant's closing argument, which preceded the state's rebuttal closing argument, defense counsel stated: "They talk about crime scene hygiene, preserving the scene of a crime in a way so that you can really find the clues. _This was more like a bonfire for the volunteer fire department of Ansonia. They got forty or fifty volunteer firefighters, presumably pleased as punch can be out doing something in the middle of the night,_ all traipsing through the crime scene. How are . . . any of us supposed to reconstruct the crime scene when a cattle call has gone rushing through there, and no effort has been made to preserve the evidence." (Emphasis added.)

Although "a prosecutor *generally* is not prohibited from referring to facts in evidence during arguments to the jury"; (emphasis added) *State* v. *Melendez*, 291 Conn. 693, 719, 970 A.2d 64 (2009); a comment supported by the evidence still can amount to an improper appeal to emotions, depending on the facts and circumstances of each case and the context of the words used. See *State* v. *Warholic*, supra, 278 Conn. 377 ("[c]ontrary to the state's argument, the fact that the prosecutor's comment may have been based on the evidence does not cure an otherwise improper appeal to the jury's passions and emotions"). The analysis is not limited to whether the comment has some evidentiary basis; we also look to whether the comment solely was intended to appeal to the passions and emotions of the jury, in which case it is improper. See, e.g., *State* v. *Gilberto L.*, 292 Conn. 226, 247, 972 A.2d 205 (2009) (statements that victim "had to be helped up into the [witness] chair," "had to be scooched forward a little bit to reach the microphone" and "her feet were dangling from the edge of the chair" not improper because "comments were part of the prosecutor's argument that the victim would have had no motive to be untruthful about what had happened *because* of her youth and innocence" [emphasis in original; internal quotation marks omitted]); *State* v. *Warholic*, supra, 376–77 (comment asking male jurors to identify with victim not improper because it was made "for the purpose of weighing [victim's] credibility," but comment that the victim is "a cute little kid" improper because "sole purpose of this remark could only have been to encourage the jury to sympathize with [the victim] and to decide the case on the basis of passion and emotion" [internal quotation marks omitted]); *State* v. *Ancona*, supra, 270 Conn. 602 (comment referencing monument in Washington honoring deceased police officers "improperly appealed to the passions of the jury and injected an extraneous matter

into the trial" when "monument bore no arguable relation to any issue in the case" and "invocation of the memory of slain police officers created a risk of diverting the jury's attention away from the issues before it").

We agree with the state, however, that the first set of comments challenged by the defendant were not improper because the prosecutor was responding to defense counsel's reference to the fire as a nonserious event for the volunteer firefighters who responded. As mentioned, during the defendant's closing argument, defense counsel stated: "This was more like a bonfire for the volunteer fire department of Ansonia. They got forty or fifty volunteer firefighters, presumably pleased as punch can be out doing something in the middle of the night, all traipsing through the crime scene." The prosecutor clearly was referencing defense counsel's comment when he stated: "I don't know if all those guys are eager to go out and risk their lives as counsel would like you to believe, but, it is, it is a small fire department. And, what did all the evidence show? That this is a town where people come together to help their neighbors." We also conclude that the remainder of the challenged statements were not an inappropriate response to defense counsel's comments. See footnote 13 of this opinion. We reiterate that not "every use of rhetorical language or device [by the prosecutor] is improper." (Internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 594. We cannot conclude that the prosecutor passed the limits of legitimate argument and fair comment in this instance.

B

The defendant next challenges the prosecutor's comments in which he described DiCantio's testimony as "typical understatement," stated that DiCantio "built [his home] with his own two hands," and referred to

the fire as a "bad dream" and "everybody's nightmare."[15] There was no defense objection to these statements at trial. The defendant argues that the prosecutor's comment describing DiCantio's testimony as "typical understatement" was meant not only to arouse "the emotions of the jury, but [that the prosecutor] also interjected his own subjective opinion characterizing the testimony of the witness." According to the defendant, the statement that DiCantio built his home "with his own two hands" was irrelevant and improperly painted an image intended to evoke sympathy from the jury. The defendant also argues that referring to the fire as a "bad dream" and a "nightmare" bore no relevance to the elements of the crime and "was nothing more than a naked plea for sympathy." The state argues that the comment regarding DiCantio having built his house "with his own two hands" was based on DiCantio's testimony and was relevant to whether 21 Martin Terrace was DiCantio's "residence and hence a building, one of the required elements of arson in the first degree as charged." See footnote 11 of this opinion. The state argues as well that the prosecutor's reference to the fire as a "bad dream" and a "nightmare" was based on DiCantio's "testimony that he did not know what could have caused the blaze" and, accordingly, "was directly relevant to whether the fire was incendiary in nature, another required element of arson in the first degree."

We conclude that the comment describing DiCantio's testimony as "typical understatement" was not improper. We do not consider this comment to be of the type that appeals to the emotions, passions or prejudices of the jury. As to the argument that the comment

---

[15] The prosecutor's comments were as follows: *"Mr. DiCantio talked to you in the tone I would have to call 'typical understatement.' Now, when he talked about a home, that he built with his own two hands, ablaze, what did he tell you he thought it was? It was just a bad dream. I said it in my first statement, it wasn't just a bad dream. That's everybody's nightmare. It was his nightmare that he had to stand across the street and watch his home that he built lit up for no reason."* (Emphasis added.)

constituted an improper expression of opinion, the prosecutor was not expressing his opinion as to DiCantio's testimony but, rather, simply was describing the tone of the testimony. The comment also was based on the evidence and the reasonable inferences to be drawn therefrom. "We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like. . . . [C]ounsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts, and the reasonable inferences to be drawn therefrom, for which there is adequate support in the record. We therefore never have categorically barred counsel's use of such rhetorical devices . . . as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party." (Internal quotation marks omitted.) *State* v. *Boutilier*, 133 Conn. App. 493, 506, 36 A.3d 282, cert. denied, 304 Conn. 914, 40 A.3d 785 (2012). We conclude that the comment was not likely to confuse the jury or prejudice the defendant and, therefore, was not improper.

Regarding the prosecutor's comments that DiCantio "built [his home] with his own two hands" and his references to the fire as a "bad dream" and a "nightmare," we first note that the comments were based on the victim's testimony.[16] The comments also were not

_____

[16] The following colloquy occurred during the state's direct examination of DiCantio:

"Q. What was going through your mind when you were watching your home in flames?

"A. I was hoping it was a bad dream, and someone was going to wake me up and it was all over, but that wasn't the case. I was wondering, how

directed at the defendant and, thus, were unlikely to inflame the passions of the jury. Additionally, we consider the comments to be relatively benign. See *State* v. *Medrano*, 131 Conn. App. 528, 546, 27 A.3d 52 (prosecutor's description of defendant as "hunting down his prey" "is relatively benign compared to the more overt characterizations the court deemed improper in [*State* v. *Williams*, supra, 204 Conn. 546]" [internal quotation marks omitted]), cert. granted on other grounds, 303 Conn. 912, 32 A.3d 965 (2011). Finally, as to the comment regarding "everybody's nightmare," we recognize that "something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 594. Accordingly, we conclude that the second set of comments was not improper.

## C

The defendant next challenges the prosecutor's comments describing the defendant as having "betrayed" various people, evoking the image of an elderly sleeping man whose home and peace of mind never will be the same, and referencing "justice."[17] The defendant argues

did this happen, you know. I had no idea how it could have caught fire. I was worried about the house. Would I be able to go back into the house? Things of that sort."

On cross-examination by defense counsel, the following colloquy occurred:

"Q. You stood across the street and looked, at some point hoping it was a bad dream, correct?

"A. Correct.

"Q. And one of the first thoughts that crossed your mind is, something must have gone wrong with your car?

"A. No."

[17] In context, the prosecutor's comments were as follows: "On April 15, 2008, [*the defendant*], *a junior firefighter, betrayed his fellow firefighters. He betrayed his neighbors. He betrayed his friends who were on that volunteer fire department. He even betrayed his own relatives. His own father had to show up to fight that fire. He endangered the life of a sleeping, soundly sleeping, elderly man, in the home that he built and raised his family in. He endangered the lives of those fellow firefighters, and those police officers, who have to go out to those scenes when that tone goes off.*

that the challenged comments were irrelevant to the case, improperly appealed to the emotions and sympathies of the jury, and improperly expressed the prosecutor's subjective opinion. The state argues that because the comments were based on the evidence, were responsive to the defendant's arguments and were appropriate rhetorical flourishes, they were not improper.

We consider the repeated references to "justice," given their context, to be improper. Lawyers frequently invoke "justice" in arguing their cases. Asking a jury, in a general, amorphous sense, to do "justice" is not

Why? You know, why? Why would you? You know, I'm sure that's the question everybody's had right? Why? Why would you do something? Well again, those elements are what we have to prove, not the why.

"But, I'll give you a why. The evidence shows why a young kid like [the defendant] would light that fire. So, he could go and put it out being the hero running down that street, running down to that fire, get into that fire hydrant, putting on his new turnout gear, be with his father. Why? Because Ansonia hadn't had a structure fire in a long time. Two of those kids came in and told you that. The firefighters came in and told you that, a quiet department. He was urging for a fire for the thrill of it.

*"These people put their lives on the line. Mr. DiCantio's home, and peace of mind, will never be the same, for what reason? For the thrill of it. For the thrill of it. They were endangered for nothing more than a cheap thrill. . . .*

"In a trial like this one, [justice is] done not by those on this side of the box, the prosecutor, the defense attorney, the judge, the witnesses. It's done by those on your side of the box. You have to do justice in this case. *What does justice require in a case like this? To do justice for the DiCantios in the world, for those firefighters, and those police, who are out there right now waiting for the next tone."* (Emphasis added.)

Defense counsel objected at this point on the ground that the prosecutor improperly was appealing to sympathy. The court overruled the defendant's objection, and the prosecutor continued with his argument: *"You should do justice for those firefighters who risked their lives on this day, and do justice for those neighbors who came out to help that night. So, what does justice demand? What does it require? What does the evidence overwhelmingly show? I think you all know the answer to that question. The answer to that question, ladies and gentlemen, can be none other than this individual, [the defendant], is guilty of arson in the first degree."* (Emphasis added.)

improper. But a lawyer crosses the line when arguing that "justice" requires a *particular* result in a *particular* case, e.g., conviction of the defendant. This is simply another way of telling a jury that its verdict will be *unjust* if it does not find the defendant guilty. We cannot countenance such an argument. In this case, the comments that the jury "should do justice for those firefighters who risked their lives" and "for those neighbors who came out to help that night," and that "justice demand[s]" and "require[s]" the jury to find the defendant guilty amounted to improper appeals to emotions. See *State* v. *Thompson*, 266 Conn. 440, 474, 832 A.2d 626 (2003) (statement that parents of victim "want the person that killed their son brought to justice" "improperly appealed to the passions of the jurors by suggesting that in order to grant justice to the victim's family, the jurors should find the defendant guilty" [internal quotation marks omitted]). The comments also constituted improper expressions of the prosecutor's opinion as to the defendant's guilt. See *State* v. *Mills*, 57 Conn. App. 202, 207 n.10, 208, 748 A.2d 318 (comment that "justice in this case requires a murder conviction" was improper expression of opinion [internal quotation marks omitted]), cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000). In this instance, equating "doing justice" with finding the defendant guilty overstepped the bounds of legitimate argument.

We do not, however, conclude that the remainder of the challenged comments were improper. We recognize that the repeated references to betrayal might constitute an improper appeal to the passions and emotions of the jury in certain situations because such comments can create an undue risk that the jury would find the defendant guilty, in part, on the basis of a negative character trait rather than "according to a rational appraisal of the evidence . . . ." (Internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 59, 975

A.2d 660 (2009); see id. ("[a]n improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character"). But the context of a prosecutor's remarks must be considered in evaluating whether an impropriety has occurred. In this case, we conclude that the prosecutor was responding appropriately to defense counsel's assertion that the fire was a nonserious event for the emergency personnel who responded. See part II A of this opinion. Although the comments regarding betrayal were not directly responsive to defense counsel's arguments, defense counsel invited the comments by implying that the emergency personnel were pleased to respond to the fire. The prosecutor replied by arguing to the jury that the defendant's actions constituted a betrayal of fellow firefighters, neighbors, friends and relatives. Similarly, we also conclude that the statement that the defendant "endangered the lives of those fellow firefighters, and those police officers, who have to go out to those scenes when that tone goes off" was an appropriate response to defense counsel's arguments.

The statement that the defendant "endangered the life of a sleeping, soundly sleeping, elderly man, in the home that he built and raised his family in" was merely a rhetorical flourish that was based on the evidence. Additionally, the prosecutor's statement that people "were endangered for nothing more than a cheap thrill" was relevant to the defendant's motive, an issue the jury properly may consider. See *State* v. *Ramsundar*, 204 Conn. 4, 14, 526 A.2d 1311 (although "[m]otive is not an element" of arson in the first degree, "[s]uch evidence is . . . important" because "[i]t strengthens the state's case" [internal quotation marks omitted]), cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). Therefore, out of the third set of comments challenged by the defendant, we conclude that only the references to justice were improper.

## D

Last, the defendant challenges the prosecutor's use of a PowerPoint presentation that summarized testimony.[18] We have reviewed the pertinent exhibits. The

[18] During the state's closing arguments, the prosecutor displayed nine PowerPoint slides on an overhead projector. Four slides contained text setting forth the elements of arson in the first degree and summarizing aspects of the testimony of DiCantio, Langrieger (TJ), Morisseau (SM), Perez (NP) and Lynch. The remaining five slides were photographs admitted as full exhibits. The defendant takes issue only with the slides that contained text.

The first slide contained the following text:

"ARSON IN THE FIRST DEGREE

- The Defendant intended to destroy or damage a building. Building means a structure that may be used by people as a residence. (21 Martin Terrace)
- The Defendant started or caused a fire.
- The building was inhabited or occupied when the fire occurred. (Pat DiCantio)"

The seventh slide contained the following text:

"Brian Francione Admits to:

- TJ — I Lit the house on fire . . . . Because Ansonia hasn't had a structure fire lately.
- SM — when asked if he started the fire by SM the defendant says yes because Ansonia hasn't had a structure fire in a while.
- SM says to the Defendant So you did start the fire. The Defendant says YES.
- NP — Don't tell anyone but I started the fire. I was urging for a fire."

The eighth slide contained the following text:

"Brian Francione Admits to:

- SM — Cops show up at her house looking for SM's mother. The Defendant says upon the cops departure . . . . I bet you they think I started the fire. Defendant's face turned bright red and he leaves immediately.
- SM — The Defendant asks SM if she talked to the police. SM says no. Defendant says I set the Martin Terrace fire not the one on Wakelee Avenue. I swear to God."

The ninth slide contained the following text:

"Brian Francione Police Interview

- When interviewed at Ansonia High school the Defendant denies any involvement.
- States he was at TJ's House prior to the fire and responded to the Tone.
- Very nervous during the interview.
- Doesn't mention Tartaglia."

After the prosecutor finished his rebuttal closing argument, the defendant moved to preserve a copy of the PowerPoint presentation for the record. Defense counsel explained: "The state characterized the statement

defendant argues that the prosecutor, in using the PowerPoint presentation, "improperly characterized the evidence; improperly offered his subjective opinion concerning the evidence; improperly commented on facts not in evidence; improperly commented negatively on the defendant's character; improperly highlighted . . . the prosecutor's subjective opinion concerning what the jury should consider as the most salient points of evidence; and repeatedly improperly appealed to the emotions and sympathies of the jurors." The state responds that all of the statements in the presentation directly were attributable to witness testimony, and, therefore, "it was not improper for the trial prosecutor to show exhibits or summaries as a way to remind the jury of the evidence presented."

We agree with the state that, without more, "the mere use of a PowerPoint presentation does not rise to the level of an impropriety." It is "the legitimate and long-standing purpose of all closing argument" to "comment upon facts properly in evidence and upon reasonable inferences to be drawn from them." (Internal quotation marks omitted.) *State* v. *Pereira*, 72 Conn. App. 545, 571, 805 A.2d 787 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003). As such, "counsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts, and the reasonable inferences to be drawn therefrom, for which there is adequate support in the record. We therefore never have categorically barred counsel's use of such rhetorical devices, be they linguistic or in the form of visual aids, as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party. . . . [T]he use of such aids is a matter entrusted to the sound discretion

of certain witnesses, including the testimony that I had objected to, and I want to be able to show an appellate court prejudice, in the event that it occurs."

of the trial court." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 767, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). In this instance there would have been no meaningful distinction between presenting the information contained on the slides orally and displaying it on an overhead projector. The slides were not improper because all of the information adequately was supported by the evidence, the prosecutor was not appealing solely to the emotions of the jury,[19] the prosecutor did not improperly express his opinion as to the guilt of the defendant or the credibility of the witnesses, and there was no reasonable likelihood that the presentation would confuse the jury or prejudice the defendant.

E

We next address whether the references to "justice," which we have concluded were improper, were so prejudicial as to amount to a denial of the defendant's due process right to a fair trial. "In other words, we must decide whether the sum total of [the state's attorney's] improprieties rendered the defendant's [trial] fundamentally unfair. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Bermudez*, 274 Conn. 581, 599, 876 A.2d 1162 (2005). We conclude that the prosecutorial improprieties did not deprive the defendant of his right to a fair trial.

As mentioned, we evaluate the defendant's due process claim in light of the factors enumerated by our Supreme Court in *State* v. *Williams*, supra, 204 Conn. 540.[20] We agree with the state that the references to

_____

[19] In contrast, each of the slides were directly related to the elements of the crime.

[20] "These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the fre-

"doing justice" partly were in response to defense counsel's comments to the jury, including the statement that "[t]his young man's destiny is in your hands, nobody else's."[21] We conclude that the improper comments were neither severe nor frequent. Moreover, although the defendant objected to these comments, he did not request curative instructions or move for a mistrial. See *State* v. *Ancona*, supra, 270 Conn. 593 (failure to object, request curative instruction or move for mistrial indicates defendant "presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize [his] right to a fair trial" [internal quotation marks omitted]). The improper comments were not central to the critical issue of the case, which was the credibility of Langrieger, Morisseau and Perez. Although the trial court did not provide specific curative instructions, it did remind the jury that closing arguments were not evidence, to rely on its memory of the evidence rather than on counsel's recitation of the evidence, and not to "be influenced by any sympathy for the defendant, the defendant's family, the complainant, or any other person who might in any way be affected by your decision." Finally, we conclude that the state's case was strong in light of the defendant's numerous admissions and the other evidence indicating that the defendant set the fire with the requisite intent. See part I of this opinion. Accordingly, we conclude that the improper comments did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

quency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." *State* v. *Warholic*, supra, 278 Conn. 361.

[21] Defense counsel also stated, shortly thereafter: "You don't know what the consequences of the guilty verdict will be, but you can imagine. You know this isn't a scholarship contest. You've seen the state's attorney's voice quick with mock rage about the outrage, and the lives risked, and you know what he'll ask for another day, another time, if you let him. And I would say you ought not to let him."