******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* GILBERTO O.
MARRERO-ALEJANDRO
(AC 37165)

DiPentima, C. J., and Lavine and Alvord, Js.

*Argued April 14—officially released August 25, 2015*

(Appeal from Superior Court, judicial district of New
Britain, D'Addabbo, J.)

*James B. Streeto*, senior assistant public defender,
for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with
whom, on the brief, were *Brian Preleski*, state's attorney, and *John H. Malone*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Gilberto O. Marrero-Alejandro, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal the defendant claims that (1) his due process rights were violated as a result of improper remarks made by the prosecutor during closing argument and rebuttal, (2) the trial court improperly denied his motion to suppress certain statements he made to the police and certain DNA evidence, (3) the court improperly admitted uncharged misconduct evidence, and (4) the court abused its discretion in denying his request to replace his trial counsel. We affirm the judgment of the trial court.

The defendant's conviction arises from the murder of the victim, Jose Cruz-Diaz. The jury reasonably could have found the following facts on the basis of the evidence presented at trial. In August, 2010, the defendant resided in Bristol after moving from Puerto Rico earlier that spring. His friend Henry Bermudez helped him move to Connecticut. During that summer, Bermudez worked for a drug ring run by Christian Bonilla. The defendant then began working for Bonilla selling illegal drugs. Carrie Skinner purchased narcotics from Bonilla and met the defendant during these drug transactions. The defendant subsequently began a romantic relationship with Skinner. During this time, Skinner also was dating the victim a rival drug dealer. Skinner's simultaneous romantic relationships led to a toxic love triangle among the victim, the defendant, and herself.

Bonilla and the victim were engaged in a turf war over the Bristol drug scene. Bonilla allegedly stole a gold chain from the victim, and in retaliation, on August 13, 2010, the victim shot at Bonilla's car. In an effort to seek revenge against the victim, Bonilla offered to pay the defendant $1000 to kill him. On August 15, 2010, the defendant traveled to the victim's home in Bristol and shot him multiple times. The defendant fled on foot. An eyewitness recovered a sweatshirt near the crime scene and gave it to the police. After the shooting, the defendant left the state. Bermudez bought the defendant a bus ticket to Springfield, Massachusetts and gave him $1000 from Bonilla for killing the victim.

On August 23, 2010, the Massachusetts State Police executed an outstanding warrant on Oscar Rivera at his apartment in Springfield. The defendant had no identification when the police found him in Oscar Rivera's apartment. He agreed to accompany the officers to the police station for fingerprint identification. Carlos Rivera, a Massachusetts state trooper, became aware that the Bristol Police Department had an interest in speaking with the defendant. While he was at the station, the defendant agreed to talk to Bristol police officers who had traveled to Springfield to speak with him

regarding the victim's death. The Bristol officers questioned the defendant at the local district attorney's office for approximately one hour and forty minutes before the defendant invoked his right to counsel and stopped the interview.

Before the defendant left the district attorney's office, the Bristol police officers asked him for permission to obtain a buccal swab of his mouth. The defendant agreed. Biological material from the swab was tested to determine the defendant's DNA profile. The sweatshirt tested positive for the presence of gunshot residue on both cuffs and inside the front right pocket. The DNA analysis of the biological material taken from the front pocket of the sweatshirt and from the buccal swab could not eliminate the defendant as a contributor to the DNA profile.

The defendant was arrested and charged with murder in violation of § 53a-54a. He pleaded not guilty and elected a trial by jury. After the jury found the defendant guilty, the court sentenced him to sixty years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that he was deprived of his due process right to a fair trial as a result of prosecutorial impropriety. In particular, the defendant claims that the prosecutor improperly (1) misstated the facts of the case and (2) appealed to the emotions, passions, and prejudices of the jury during his closing argument and rebuttal. The state argues that the prosecutor's comments were not improper. Alternatively, the state contends that even if some of the prosecutor's comments were improper, none of them deprived the defendant of a fair trial. We do not agree that the prosecutor engaged in impropriety and, accordingly, reject the defendant's claim.

Our standard of review is well established. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 319, 112 A.3d 175

(2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

Because the claimed prosecutorial improprieties occurred during closing arguments, we advance the following legal principles. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Chase*, 154 Conn. App. 337, 342–43, 107 A.3d 460, cert. denied, 315 Conn. 925, 109 A.3d 922 (2014). The defendant concedes that he did not object at trial to any of the statements that he now claims constituted prosecutorial impropriety. "It is well established law, however, that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)]." *State* v. *Grant*, supra, 154 Conn. App. 319.

On appeal, the defendant claims that the prosecutor "engaged in a pattern of prosecutorial impropriety."[1] He argues that the prosecutor "engaged in a vicious attack on the defendant, argued facts not in evidence, appealed to the jury's emotions, and denigrated the defendant's credibility."[2] We consider the arguments raised in support of the defendant's claim as falling into two broad categories: that the prosecutor improperly (1) misstated facts of the case and (2) appealed to the emotions, passions, and prejudices of the jury. We will address each in turn.

A

We first examine the defendant's claim that, during closing argument, the prosecutor made a number of improper comments that misstated the evidence and argued facts not in evidence. Specifically, the defendant argues that the prosecutor misstated the DNA evidence and argued facts not in evidence related to the state's witness, Bermudez. We disagree with the defendant.

The defendant argues that the prosecutor in his closing argument committed "the prosecutor's fallacy" by improperly equating random match probability with source probability in relation to the DNA evidence presented.[3] The defendant takes issue with the prosecutor's statement made during his closing argument: "Now, what we've learned of the DNA evidence is the chances of someone else wearing those pants is one [in] seven

billion, seven billion being the number of people on this earth, for the sweater, particularly the pocket of the sweater the chances of someone else other than the defendant leaving that is one in seven billion that piece of DNA." The state argues that the prosecutor's comment "did not equate the random match probability with the probability that the defendant was guilty of the crime charged but, rather, used the statistics to suggest that the jury could infer that his DNA was found in the hooded sweatshirt, among other items." We agree with the state.

Under the totality of the circumstances, we conclude that the prosecutor's comment regarding the DNA evidence, an inherently complex subject, was not improper. The jury heard extensive testimony from Cheryl Carreiro, a DNA analyst at the state forensic science laboratory, regarding the testing of the defendant's DNA. "A prosecutor may invite the jury to draw reasonable inferences from the evidence . . . such inferences must be both reasonable and based on facts in evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Swain*, 101 Conn. App. 253, 272, 921 A.2d 712, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007). In the present case, the prosecutor's statement invited the jury to draw reasonable inferences from the DNA evidence. The jury was free to reject the invitation. We, therefore, cannot conclude that the prosecutor's comment was improper.

Next, the defendant claims that "the prosecutor also argued two points not in evidence: the inner workings of drug organizations, and the reasons Bermudez could get into trouble if he lied." The prosecutor's statements asked the jury not to disregard Bermudez' testimony simply because he had a criminal record and was a member of a drug organization. During his rebuttal, the prosecutor also stated that Bermudez had immunity and no motive to lie. The state argues that such facts were in evidence through the testimony of Bermudez.

On the basis of our review of the record, we conclude that the prosecutor's statements constitute an argument that invited the jury to draw reasonable inferences from the evidence adduced at trial. Bermudez testified as to his involvement in the drug organization and to the terms of the immunity agreement he made with the state prior to testifying at the defendant's trial.[4] "[I]t is not improper for a prosecutor to remark on the motives that a witness may have to lie, or not to lie, as the case may be." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 585, 849 A.2d 626 (2004). It therefore was not improper for the prosecutor to comment on facts entered into evidence and to argue that Bermudez had no motive to lie given the scope of his immunity agreement. In sum, the prosecutor's statements during closing argument and rebuttal did not constitute prosecutorial impropriety.

B

We next examine the defendant's claim that, during closing argument and rebuttal, the prosecutor used sarcasm and personally attacked the defendant, which impermissibly appealed to the emotions of the jury. We are not persuaded that the prosecutor crossed the tenuous line between vigorous permissible argument and prosecutorial impropriety.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Similarly, a prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. . . . Additionally, a prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Citation omitted; internal quotation marks omitted.) *State* v. *Francione*, 136 Conn. App. 302, 315, 46 A.3d 219, cert. denied, 306 Conn. 903, 52 A.3d 730 (2012).

The first statement at issue occurred in the beginning of the prosecutor's closing argument, when the prosecutor commented on how the victim was shot in the back while retreating and classified the act as "certainly a cowardly way to confront somebody . . . ." The defendant argues that this was a personal attack on the defendant. "[A]n improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . ." (Internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 37, 66 A.3d 520 (2013). The state contends that the prosecutor's statement was not an impermissible attack on the defendant but, rather, a comment on the evidence. "[I]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Luther*, 114 Conn. App. 799, 811–12, 971 A.2d 781, cert. denied, 293 Conn. 907, 978 A.2d 1112 (2009). Personal attacks on the defendant are not appropriate; nonetheless, in this case, the prosecutor's statement was not improper. The record supports the state's claim that the prosecutor's statement was meant to comment on the evidence that the victim was ambushed and shot in the back numerous times, not on the defendant's character. The prosecutor's statement may have approached the line separating proper from improper comment, but we do not think

that that line was breached.

The second set of statements the defendant contests relate to the prosecutor's closing argument and rebuttal during which he accused the defendant of lying. In the first instance, the prosecutor characterized the defendant's inconsistencies in his story as: "[t]he defendant . . . was lying, I would submit to you, to protect himself." In addition, the prosecutor commented on the defendant fleeing the state and writing letters in which he hinted as to his involvement in the shooting. In the prosecutor's rebuttal, he stated that, when the defendant was questioned by the police, he denied having a close relationship with either Bonilla or Skinner. The evidence showed, however, that the defendant worked for Bonilla, complied with orders from him, and had a romantic relationship with Skinner that led to a love triangle and jealousy among Skinner, the defendant, and the victim. "When reviewing a claim of prosecutorial impropriety, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Chase*, supra, 154 Conn. App. 345.

On the basis of our review of the record, we conclude that the prosecutor's second set of statements did not necessarily express his personal opinion but, rather, commented on the evidence presented at trial. We are mindful that it is *unprofessional* for a prosecutor to argue that a defendant is a liar. See *State* v. *Spyke*, 68 Conn. App. 97, 113, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002). We are satisfied, however, that in this case, the comments posited reasonable inferences that the jury could have drawn without access to the prosecutor's personal knowledge or opinion of the case. See *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003) (concluding no impropriety when statement defendant lied followed detailed summary of evidence supporting inference); *State* v. *Washington*, 155 Conn. App. 582, 609, 110 A.3d 493 (2015) ("[i]t is permissible for a prosecutor to ask the jury to infer that a defendant testified untruthfully if there is a reasonable basis in the evidence on which to draw such an inference"). "We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Luther*, supra, 114 Conn. App. 812. On the basis of the evidence, the jury reasonably could have inferred that the defendant was untruthful about the events surrounding the shooting and his relationships with Bonilla, the victim, and Skinner.

Next, the defendant claims that the prosecutor improperly disparaged the defense's case during rebut-

tal when he used sarcasm to characterize the defense's case as suggesting that the police should have been "looking for a nine foot tall black non-Hispanic man" wearing the defendant's hoodie. The state argues that in his closing argument, the defendant conceded that the only issue in the case was the identity of the shooter. In arguing his theory during closing argument, the defendant focused on the testimony of an eyewitness who initially described the shooter as a tall, non-Hispanic, dark skinned man. The defendant contrasted this eyewitness description with his physical features to demonstrate that he could not have been the shooter. Immediately following the statement in issue, the prosecutor stated: "I guess if we're to follow [the defendant's] logic we have to be looking for a nine foot tall black non-Hispanic man wearing the defendant's hoodie such as it is." Therefore, according to the state, the prosecutor's comments were made in response to the defendant's closing argument. We agree.

"Although we neither encourage nor condone the use of sarcasm, we also recognize that not every use of the rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . [S]ome use of sarcastic and informal language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Grant*, supra, 154 Conn. App. 321. "It is not improper . . . for a prosecutor appropriately to respond to statements made by defense counsel during the defendant's closing argument." *State* v. *Francione*, supra, 136 Conn. App. 315. In this case, the prosecutor clearly was referencing the defendant's reliance on one eyewitness account while ignoring the other evidence pointing to him as the shooter. As noted, not every use of rhetorical language is improper. Lawyers must have reasonable latitude to make vigorous arguments to the jury. We, therefore, cannot conclude that the prosecutor's comments were improper.

In sum, the prosecutor's statements during closing argument and rebuttal did not constitute impermissible appeals to the jury's emotions. Because we conclude that the prosecutor's statements were not improper, we need not consider whether any claimed impropriety deprived the defendant of his right to a fair trial. See *State* v. *Otto*, 305 Conn. 51, 76 n.19, 43 A.3d 629 (2012).

II

The defendant next claims that the court improperly denied his motion to suppress the oral statements that he made to the Bristol police at the district attorney's office in Springfield and the DNA evidence obtained from the buccal swab. Although the defendant acknowledges that he was advised of his *Miranda* rights,[5] he argued at trial that he waived them involuntarily. The

defendant now contends that his statements should have been suppressed because they were involuntarily made while he was in custody, in violation of his *Miranda* rights. The defendant also claims that the court improperly denied his motion to suppress with respect to the DNA evidence because it was obtained after he invoked his right to counsel. We disagree.

The following facts that the trial court reasonably could have found are relevant to our resolution of this claim. Before trial, the defendant filed a motion to suppress, and the court conducted an evidentiary hearing. On May 9, 2013, the court issued a memorandum of decision in which it denied the motion. In its memorandum of decision, the court found the following facts. On August 23, 2010, the Massachusetts State Police executed an outstanding arrest warrant on Oscar Rivera at his apartment. The defendant was found sleeping in the apartment, and the police asked him to accompany them to the police station and to submit to fingerprint identification, to which the defendant voluntarily agreed. The state police used the defendant's fingerprints to determine whether there were any outstanding warrants against him; there were none. Trooper Rivera, however, asked the defendant if he would speak with the Bristol police officers. The defendant answered in the affirmative and waited in the public lobby of the police station. The court heard testimony that at approximately 11 a.m. Bristol police Detectives Peter Dauphinais, Garrie Doorman, and Gary Heinz arrived in Springfield. With the interpreting assistance of Trooper Rivera, the Bristol police asked the defendant to speak with them at the local district attorney's office. The defendant agreed and traveled, without any physical restraints, to the office in Dauphinais' police vehicle.

The trial court determined that at the time the defendant was questioned, he was not under arrest. The questioning took place in a fifteen by twenty foot conference room. The defendant was not restrained and was free to leave. Dorman and Dauphinais requested that Trooper Rivera give the defendant his *Miranda* advisement, which was given orally in Spanish and in print in Spanish. The defendant answered that he understood his rights and waived them by initialing and signing both *Miranda* forms.

The interview was videotaped and admitted into evidence. Throughout the interview, the defendant maintained that he was not involved in any criminal activity and denied knowing the victim. In response to being accused of lying, the defendant stated: "If they have proof and they believe that I am lying, I will get an attorney, and I am not going to talk anymore." Trooper Rivera engaged in a colloquy to determine whether the defendant was invoking his right to counsel or conditioning it upon the continued accusation that the defendant was a liar. The defendant indicated the latter and

continued to answer questions. After approximately one hour and forty minutes of questioning, the defendant declared that he wished to cease the interview. The police complied with that request. Prior to leaving, Trooper Rivera explained to the defendant that the Bristol police were requesting his consent for permission to use a buccal swab to obtain a DNA sample. The defendant voluntarily signed the "Consent to Search Form," and the police subsequently obtained and tested the defendant's DNA.

In its memorandum of decision, the court concluded that the defendant was not in custody, and, therefore, the police were not required to advise the defendant of his *Miranda* rights. The defendant, however, had been advised of his *Miranda* rights, and the court found that he knowingly and voluntarily had waived them. The court further concluded that the state had met its burden of proving that the defendant's statements were made voluntarily and thus denied the defendant's motion to suppress his oral statement and videotape depiction thereof. On appeal, the defendant claims that his statements were a product of a custodial interrogation and were involuntary. We are not persuaded.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Collin*, 154 Conn. App. 102, 121, 105 A.3d 309 (2014), cert. denied, 315 Conn. 924, 109 A.3d 480 (2015).

A

We first consider whether the court properly found that the defendant was not in custody at the time the statements in issue were made. "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda* [v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reason-

able person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . .

"Furthermore, we note that [n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the *Miranda* court expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely . . . circumstances relating to those kinds of concerns are highly relevant on the custody issue. . . .

"The defendant bears the burden of proving custodial interrogation. . . . The trial court's determination of the historical circumstances surrounding the defendant's interrogation are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 416–17, 40 A.3d 290 (2012).

In concluding that the defendant was not in custody at the time he made the statements to the Bristol police, we look to the following relevant factors. First, the defendant voluntarily accompanied the police to the station and then to the district attorney's office for questioning. See *State* v. *Edwards*, 299 Conn. 419, 434–35, 11 A.3d 116 (2011). Second, the defendant was not handcuffed, shackled, or otherwise restrained, and was not placed under arrest. See *State* v. *Britton*, 283 Conn. 598, 612, 929 A.2d 312 (2007). The officers informed the defendant that he could leave at any time, and, after approximately one hour and forty minutes of questioning, the defendant did in fact terminate the interview and leave the office of his own free will. On the basis of our review of the record, we conclude that a reasonable person in the defendant's position would not have believed that he was in custody at the time he made his statements.

We now consider whether the defendant's statements to the police were voluntary. "In order to be voluntary

a confession must be the product of an essentially free and unconstrained choice by the maker. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Richard S.*, 143 Conn. App. 596, 615, 70 A.3d 1110, cert. denied, 310 Conn. 912, 76 A.3d 628 (2013).

"Whether a confession is involuntary because it was coerced rests upon the factual determinations regarding the circumstances surrounding the defendant's confession. . . . Although the ultimate question of voluntariness is one of law over which our review is plenary, the factual findings underpinning that determination will not be overturned unless they are clearly erroneous. . . . As in other cases in which the factual findings implicate a defendant's constitutional rights and the credibility of witnesses is not the primary issue, we will, however, undertake a scrupulous examination of the record to ensure that the findings are supported by substantial evidence. . . .

"The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Citation omitted; internal quotation marks omitted.) *State* v. *Jackson*, supra, 304 Conn. 419–20.

We conclude that under the totality of the circumstances the defendant's statements were voluntarily made. The defendant argues that his statements were involuntary because of the following factors: the interrogation was long, continuous, and took place in the district attorney's office; the defendant does not speak English; and he was subjected to a police dominated atmosphere. Here, the defendant was twenty-six years old at the time of the interview in question. The police advised the defendant of his *Miranda* rights in his native language, both orally and in print. The court found that the defendant was indeed advised of his rights and knowingly and voluntarily waived them. The court further found that there was no evidence that the defendant had intellectual limitations that affected the voluntariness of his statements. The defendant concedes in his appellate brief that there was no evidence of coercion, nor was there evidence he was threatened. The court noted that nothing in the record indicated

that the defendant was subjected to exhaustive questioning or that his will was overborne. He was provided with food and a drink during approximately one hour and forty minutes of questioning at the district attorney's office. Under the totality of the circumstances, the court concluded that "there is no evidence that the defendant's decision to waive his rights and talk [with the police] . . . was anything other than the result of his free, considered, and unconstrained choice."

On the basis of our scrupulous review of the record, we conclude that the court's findings are supported by the record and, therefore, are not clearly erroneous. "[T]here is considerable overlap between the factors that courts should consider in determining whether a defendant is in custody for *Miranda* purposes and the factors that courts should consider in determining whether a defendant's statements were voluntary." *State* v. *Jackson*, supra, 304 Conn. 421. Having concluded that the defendant was not in custody when the Bristol police questioned him, we further conclude that his statements were made voluntarily and that the court properly denied the defendant's motion to suppress his oral statements.

B

The defendant also claims that the court improperly denied his motion to suppress with respect to the DNA evidence obtained from the buccal swab because the swab was taken after he invoked his right to counsel. The state argues in response that the defendant abandoned that issue at the suppression hearing and that he is, therefore, not entitled to review of it on appeal. We conclude that this claim was not preserved at trial. The defendant, however, requests that to the extent that his claim was not preserved at trial, we review it under *State* v. *Golding*, supra, 213 Conn. 239–40. We decline to review the defendant's claim.

Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id. We conclude that the defendant cannot prevail under *Golding* because his claim is not of constitutional magnitude and, thus, is not reviewable.

The defendant conceded in his reply brief and at oral argument before this court that his claim is controlled by *State* v. *Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84

L. Ed. 2d 814 (1985), because the buccal swab sample is not testimonial evidence. In *Asherman*, our Supreme Court held that, like the fifth amendment to the federal constitution, article first, § 8, of our state constitution applies *only to testimonial evidence.* Id., 713–15. We note that "[e]videntiary claims do not merit review pursuant to *State* v. *Golding*, [supra, 213 Conn. 239–40], because they are not of constitutional magnitude. . . . Regardless of how the defendant has framed the issue, he cannot clothe an ordinary evidentiary issue in constitutional garb to obtain appellate review." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 110 Conn. App. 70, 85–86, 954 A.2d 202, cert. denied, 289 Conn. 954, 961 A.2d 422 (2008). Therefore, we decline to review this evidentiary claim because it fails under the second prong of *Golding*.

### III

The defendant's third claim is that the court improperly concluded that portions of Skinner's testimony were admissible under § 4-5 (b) of the Connecticut Code of Evidence. Specifically, the defendant contends that the evidence was not relevant, and that even if it were relevant, its prejudicial effect outweighed its probative value. In response, the state argues that the testimony properly was admitted for the purpose of showing the defendant's motive. We agree with the state.

The following additional facts are relevant to this claim. Prior to trial, the defendant filed a motion in limine to preclude any evidence of prior misconduct. In response, the state filed a notice of intent to introduce six instances of uncharged misconduct, only three of which are at issue in this appeal. The state's notice stated in relevant part that it would offer the following acts of misconduct: "(2) The defendant was a member of an organization engaged in the sale of drugs; (3) The defendant stole money and drugs from [a] drug dealer [Bonilla] . . . [and]; (6) The defendant made threats against the victim's girlfriend [Skinner] because of her relationship with the victim." The state proffered that such instances of misconduct would be presented, inter alia, through the testimony of Skinner.

On February 5, 2013, the court held a hearing outside the presence of the jury on whether to admit the testimony. Skinner testified that she previously had dated the defendant and bought narcotics from him and Bonilla. Skinner testified that, in the late summer of 2010, the defendant contacted her to give him a ride out of the state because "he had taken drugs and money . . . [f]rom [Bonilla]." She testified that Bonilla wanted to recover the drugs and money that the defendant had stolen and that she conspired with Bonilla to set up the defendant. She explained that she arranged a time to meet the defendant, and when he arrived, Bonilla and others physically attacked him. She testified that the victim also was present while Bonilla assaulted the

defendant.

Skinner explained that she had started a romantic relationship with the victim during that time, and the defendant was "not happy." Specifically, Skinner testified to a particular text message exchange she had with the defendant. She indicated that the defendant had sent her the following threatening message to her cell phone numerous times: "[Y]ou better get out, I'm coming for you. I'm going to shoot up the house with everybody in it."

After hearing argument from both the state and the defendant, the court ruled that the uncharged misconduct evidence was admissible for trial. Specifically, it noted that Skinner's testimony regarding the defendant's membership in a drug organization, his theft of Bonilla's drugs and money, and his threats toward Skinner due to her relationship with the victim were relevant and material to "provide some basis for the jury to understand the relationships between the parties, and it could be interpreted, if they choose to, as to motive for a crime." The court further decided that the probative value of the uncharged misconduct evidence outweighed its prejudicial effect.

Following Skinner's testimony at trial, the court gave a limiting instruction in an attempt to minimize any prejudice that might arise out of the admission of the uncharged misconduct evidence.[6] The limiting instruction prohibited the jury from considering the uncharged misconduct as evidence of bad character. The jury could, however, consider it as evidence to show motive for commission of the charged crime.

"[O]ur standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Solomon*, 150 Conn. App. 458, 462–63, 91 A.3d 523, cert. denied, 314 Conn. 908, 100 A.3d 401 (2014).

"Pursuant to § 4-5 (b) of the Connecticut Code of Evidence,[7] evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or propensity for criminal behavior. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, *motive*, a system of criminal activity or the elements of a crime. . . .

"To determine whether evidence of a prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Citation omitted; emphasis altered; footnotes altered; internal quotation marks omitted.) *State* v. *Pereira*, 113 Conn. App. 705, 712–13, 967 A.2d 121, cert. denied, 292 Conn. 909, 973 A.2d 106 (2009).

"It is not essential that the state prove a motive for a crime. . . . But it strengthens its case when an adequate motive can be shown. . . . Evidence of prior misconduct that tends to show that the defendant harbored hostility toward the intended victim of a violent crime is admissible to establish motive. . . . Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 152 Conn. App. 318, 325, 97 A.3d 999, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014).

"[T]he primary responsibility for . . . determin[ing] whether [prior misconduct] evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . Moreover, [w]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion." (Internal quotation marks omitted.) *State* v. *Kantorowski*, 144 Conn. App. 477, 489–90, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013).

We are not persuaded by the defendant's argument that because motive was not a seriously contested issue at trial, the evidence's relevance was grossly outweighed by its prejudicial value. On the basis of our review of the record, we conclude that the court properly balanced the probative value of the evidence with its potential prejudicial effect. The court heard a lengthy offer of proof and arguments from counsel before it denied the defendant's motion in limine. By instructing the jury on uncharged misconduct, the court properly limited the jury's use of such evidence. "Absent evidence to the contrary, we presume that the jury followed the court's limiting instruction." (Internal quotation marks omitted.) *State* v. *Brown*, 153 Conn. App. 507, 532, 101 A.3d 375 (2014). Therefore, we con-

clude that the trial court did not abuse its discretion by admitting evidence of the defendant's uncharged misconduct.

IV

Finally, the defendant claims that the court abused its discretion by declining to replace his trial counsel and thereby deprived him of his federal and state constitutional rights to the effective assistance of counsel. In his appellate brief, the defendant argues that he alleged sufficient facts to demonstrate an exceptional circumstance justifying the appointment of new counsel. In doing so, he argues that his trial counsel was "unprepared and not properly concerned with this case." We are not persuaded.

We begin with our standard of review. "The court possesses broad discretion in determining whether the circumstances warrant the appointment of new counsel. . . . [A]bsent a factual record revealing an abuse of discretion, the court's failure to allow new counsel is not reversible error." (Citation omitted; internal quotation marks omitted.) *State* v. *Robert H.*, 71 Conn. App. 289, 309, 802 A.2d 152 (2002), aff'd, 273 Conn. 56, 866 A.2d 1255 (2005).

The following additional facts are pertinent to this claim. On January 17, 2013, during jury selection, the defendant stated to the court that he no longer wished to have his trial counsel represent him. Specifically, he alleged that trial counsel was unprepared for trial, uninterested in his case, and failed to provide him with documents and review motions written by the defendant.[8] When the defendant concluded, the court asked trial counsel questions regarding the defendant's allegations. The court specifically inquired about the alleged missing documents and motions, and whether trial counsel was preparing for trial. Trial counsel stated that his "practice now has been devoted to this case" and that he was prepared to represent the defendant to the best of his ability. Trial counsel explained to the court that he had shown the defendant all of the materials he had received from the state. In addition, trial counsel noted that the defendant filed his motions with the court and that trial counsel had not received a copy, but that they were presumably in the court's file.

The court then gave its oral decision. It began by identifying the issues surrounding the defendant's request for new counsel and acknowledging that the defendant is entitled to representation.[9] The court explained to the defendant that "the law is you're entitled to representation, but you can't sit back and say I don't want him. . . . So, [trial counsel] has indicated that he's—first of all he's Spanish speaking. He's very willing to represent you. He's preparing as best he can. Information has been provided. What you're seeking is not in the possession of the state's file, and your options

are basically you can have [trial counsel] represent you, you can hire an attorney if you wish, or you can represent yourself." The court further concluded that the facts did not constitute "exceptional circumstances to take [trial counsel] off of the case." Notwithstanding its rejection of the defendant's request for the appointment of new counsel, the court indicated that it would give the defendant and trial counsel time to talk and provide trial counsel more time to prepare.

"The United States Supreme Court has definitively held that due process requires that the accused have the assistance of counsel for his defense. . . . There is [however] no unlimited opportunity to obtain alternate counsel." (Citation omitted; internal quotation marks omitted.) *State* v. *Hernaiz*, 140 Conn. App. 848, 853, 60 A.3d 331, cert. denied, 308 Conn. 928, 64 A.3d 121 (2013). "A defendant has no unbridled right to discharge of counsel *on the eve of trial.* . . . In order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Emphasis in original; internal quotation marks omitted.) Id., 854.

Our review of the record supports the court's factual determination that no substantial reason existed to justify the appointment of new counsel during jury selection, much less "exceptional circumstances." The court observed that the defendant and his trial counsel appeared to communicate effectively during jury selection and confirmed with trial counsel that he was willing and prepared to represent the defendant at trial. We agree with the court's finding that exceptional circumstances did not exist and, therefore, conclude that the court did not abuse its discretion in denying the defendant's request for new counsel.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In briefing this claim, the defendant did not specify the exact language he was contesting in all instances of alleged impropriety but did cite to the page numbers of the corresponding transcript. See *State* v. *John M.*, 87 Conn. App. 301, 311 n.8, 865 A.2d 450 (2005), aff'd, 285 Conn. 822, 942 A.2d 323 (2008). We note that it would aid this court in analyzing claims of prosecutorial impropriety if the defendant includes the exact language of the argument he or she challenges.

[2] The defendant also raises several other instances of alleged prosecutorial impropriety in the first footnote of his appellate brief. He fails, however, to provide analysis as to how any of the alleged statements violated his right to a fair trial. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." *State* v. *Vazquez*, 119 Conn. App. 249, 257, 987 A.2d 1063 (2010) (Internal quotation marks omitted.). Accordingly, we decline to address the defendant's claim in footnote 1 of his appellate brief.

[3] Random match probability and source probability are distinguishable. "The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." *McDaniel* v. *Brown*, 558 U.S. 120, 128, 130 S. Ct. 665, 174 L. Ed. 2d 582 (2010). Random match probability is "the probability a member of the general population would share the same DNA" with the defendant. Id. Source probability is the probability that someone other than the defendant is the source of the DNA found at the crime scene. Id.

[4] Bermudez received immunity from any crimes related to the death of the victim and any drug offenses that he may admit to during the trial in exchange for his testimony in the defendant's case.

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] The limiting instruction stated in relevant part: "Now the state has offered evidence of other acts of misconduct of the defendant. That evidence was not admitted into evidence to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. This evidence was admitted solely to show or establish a motive for the commission of the crime alleged. . . . You may consider such evidence, if you believe it, and further find that it logically, rationally and conclusively supports the issue from which it is being offered by the state, but only as it may bear on the issue of motive . . . . On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally, and conclusively support the issue . . . then you may not consider that testimony for any other purpose."

[7] Section 4-5 of the Connecticut Code of Evidence provides in relevant part: "(a) Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

(b) Evidence of other crimes, wrongs, or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . ."

[8] The defendant stated that he asked trial counsel for a copy of text messages obtained by the state and to review motions he filed with the court. The state clarified that it was not in possession of text messages but had already provided trial counsel with a call log.

[9] The court noted that trial counsel was the second attorney appointed to represent the defendant after the first public defender was replaced because the attorney "did not speak Spanish and [the defendant] was unsatisfied apparently on that basis."